Sonal N. Mehta (CA Bar No. 222086)
WILMER CUTLER PICKERING
 HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000
Facsimile: (650) 858-6100
Sonal.Mehta@wilmerhale.com

Derek A. Woodman (*pro hac vice*)
WILMER CUTLER PICKERING
 HALE AND DORR LLP
2100 Pennsylvania Ave NW
Washington, DC 20037
Telephone: (202) 663-6000
Facsimile: (202) 230-6363
Derek.Woodman@wilmerhale.com

David Z. Gringer (*pro hac vice*)
Kalyn Heyen (*pro hac vice*)
WILMER CUTLER PICKERING
 HALE AND DORR LLP
7 World Trade Center
250 Greenwich St.
New York, NY 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888
David.Gringer@wilmerhale.com
Kalyn.Heyen@wilmerhale.com

*Attorneys for Plaintiff and
Counterclaim-Defendant Intuit Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| INTUIT INC.,<br><br>   *Plaintiff*,<br><br> vs.<br><br>HRB TAX GROUP, INC.<br>and HRB DIGITAL LLC,<br><br>   *Defendants*.<br><br> and<br><br>HRB DIGITAL LLC,<br><br>   *Counterclaim-Plaintiffs*,<br><br> vs.<br><br>INTUIT INC.,<br><br>   *Counterclaim-Defendant*. | **Case No. 5:24-cv-00253-BLF**<br><br>**INTUIT INC.'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Judge:  Hon. Beth L. Freeman<br>Hearing Date: September 30, 2024<br>Time:  9:00am |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **TABLE OF CONTENTS**

INTRODUCTION ...........................................................................................................1

BACKGROUND ...........................................................................................................3

    A.    TurboTax's Online Tax-Preparation Products....................................3

    B.    Block's Online Tax-Preparation Products .........................................4

    C.    Block's 2024 Marketing Strategy .....................................................4

    D.    Block's Deceptive Advertising ..........................................................5

    E.    Procedural History .............................................................................6

LEGAL STANDARD ....................................................................................................7

ARGUMENT .................................................................................................................7

I.    Intuit Is Likely To Prevail On The Merits Of Its Claims ...................7

    A.    Block's Advertisements Violate The Lanham Act ............................7

        1.    Block's Advertisements Are False And Deceptive ................8

            a.    Block's false and misleading claim that TurboTax products with expert and AI help were more expensive than Block's ................8

            b.    Block's false and misleading claim that Block's paid DIY products were comparable to TurboTax Live Assisted ...............10

            c.    Block's false and misleading claims that 5 million+ TurboTax consumers switched to Block.......................................................12

            d.    Block's false and misleading price claims...................................13

        2.    Block's Advertisements Were Material....................................13

        3.    Block Caused Its False Statements To Enter Interstate Commerce ...............................................................................15

        4.    Block's Advertisements Injured And Continue To Injure Intuit .....................................................................................15

    B.    Block's Advertisements Violate California and Missouri Law........16

II.    Intuit Will Suffer Irreparable Harm Absent Relief...........................16

    A.    Intuit's Reputation And Goodwill Will Be Harmed Without An Injunction.......16

    B.    Block Cannot Prove That Relief Is Unnecessary ...........................18

III.    The Equities Favor An Injunction......................................................20

IV.    The Public Interest Favors An Injunction ..........................................20

CONCLUSION ............................................................................................................20

INDEX OF EXHIBITS

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Align Technology, Inc. v. Strauss Diamond Instruments, Inc.*,
    2019 WL 1586776 (N.D. Cal. Apr. 12, 2019) ................................................................19

*Already, LLC v. Nike, Inc.*,
    568 U.S. 85 (2013)............................................................................................................18

*Clorox Co. v. Reckitt Benckiser Grp.*,
    398 F. Supp. 3d 623 (N.D. Cal. 2019) ......................................................8, 10, 11, 12, 13

*Eco Elec. Sys., LLC v. Reliaguard, Inc.*,
    2022 WL 1157481 (N.D. Cal. Apr. 19, 2022) ..............................................................15

*Factory Direct Wholesale, LLC v. iTouchless Housewares & Prods., Inc.*,
    411 F. Supp. 3d 905 (N.D. Cal. 2019) ............................................................................8

*Genus Lifesciences Inc. v. Lannett Co.*,
    378 F. Supp. 3d 823 (N.D. Cal. 2019) ............................................................................8

*Healthport Corp. v. Tanita Corp. of Am.*,
    563 F. Supp. 2d 1169 (D. Or. 2008) ........................................................................15, 16

*Lexmark Intern, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014)........................................................................................................16

*Monster Energy Co. v. Vital Pharmaceuticals, Inc.*,
    2023 WL 2918724 (C.D. Cal. Apr. 12, 2023) ..............................................................20

*Polo Fashions, Inc. v. Dick Bruhn, Inc.*,
    793 F.2d 1132 (9th Cir. 1986) ..................................................................................18, 19

*Quidel Corp. v. Siemens Med. Sols. USA, Inc.*,
    2017 WL 4654644 (S.D. Cal. Oct. 16, 2017) ................................................................14

*RingCentral, Inc. v. Nextiva, Inc.*,
    2021 WL 2476879 (N.D. Cal. June 17, 2021) ..............................................................16

*SI03, Inc. v. Musclegen Rsch., Inc.*,
    2020 WL 2468412 (E.D. Mo. May 13, 2020) ..............................................................16

*Simpson Strong-Tie Co. v. MiTek Inc.*,
    2021 WL 1253803 (N.D. Cal. Apr. 5, 2021) ................................................................13

*Skydive Arizona, Inc. v. Quattrocchi*,
    673 F.3d 1105 (9th Cir. 2012) ......................................................................................19

-ii-

*Southland Sod Farms v. Stover Seed Co.*,
    108 F.3d 1134 (9th Cir. 1997) .............................................................7, 8, 11, 13

*Sream, Inc. v. Sahebzada*, 2019 WL 2180224 (N.D. Cal. Mar. 6, 2019),
    *adopted*, 2019 WL 2180215 (N.D. Cal. Mar. 28, 2019)......................................20

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
    240 F.3d 832 (9th Cir. 2001) ...........................................................................18

*ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*,
    648 F. App'x 609 (9th Cir. 2016) ....................................................................15

*TrafficSchool.com, Inc. v. Edriver Inc.*,
    653 F.3d 820 (9th Cir. 2011) ...........................................................................16

*U-Haul Intn'l, Inc. v. Jartran, Inc.*,
    522 F. Supp. 1238 (D. Ariz. 1981) ...................................................................19

*U-Haul Intn'l, Inc. v. Jartran, Inc.*,
    793 F.2d 1034 (9th Cir. 1986) ..........................................................................19

*United States v. H&R Block, Inc.*,
    833 F. Supp. 2d 36 (D.D.C. 2011).....................................................................17

*United Tactical Sys., LLC v. Real Action Paintball, Inc.*,
    2014 WL 6788310 (N.D. Cal. Dec. 2, 2014)......................................................20

*Vineyard House, LLC v. Constellation Brands U.S. Operations, Inc.*,
    515 F. Supp. 3d 1061 (N.D. Cal. 2021) ........................................................17, 18

*Winter v. NRDC*,
    555 U.S. 7 (2008)..............................................................................................7

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C. §116(a) ...................................................................................................17

-iii-

**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**

PLEASE TAKE NOTICE that, on September 30, 2024, Intuit Inc. hereby moves for a preliminary injunction against Defendants HRB Tax Group, Inc. and HRB Digital LLC ("Block"), enjoining them from disseminating false, misleading, or otherwise unlawful advertisements.

**ISSUES TO BE DECIDED**

Whether the challenged Block advertisements violate the Lanham Act, California False Advertising Law, California Unfair Competition Law, and Missouri Common Law; and whether Intuit is entitled to a preliminary injunction concerning those advertisements.

**INTRODUCTION**

Block created and spread a false and misleading ad campaign to lure customers away from its competitor, TurboTax. There is nothing wrong with competition on the merits, but Block admits that its products are not better than TurboTax's and its prices are not uniformly lower. Thus, the marketing campaign, tellingly named "It's Better With Block," pledged to make comparisons that Block internally described ████████████████████████████ ████████████ They were also false and misleading: The deceptive claims ranged from the obviously false—such as quoting TurboTax prices at nearly double their actual cost and ignoring free TurboTax offerings—to the grossly misleading—such as making false "apples to oranges" product comparisons and incorrectly suggesting that 5 million+ "TurboTired" TurboTax consumers had switched to Block, ████████████████████████████ ██████████████ Had Intuit not sought judicial intervention, Block was prepared to launch other false ads in television and other media with similar false claims.

Block's false and misleading claims violate the Lanham Act and parallel state statutes. At the temporary-restraining-order hearing earlier this year, this Court observed that Block's ads drew "a false comparison" and that "[i]t's not true that [the TurboTax product in Block's ad] is the TurboTax Product you have to buy to get what you get, starting at $35, from Block." As a result, this Court explained that it was "inclined to find that Intuit ha[d] established a likelihood of success on the merits" and that Intuit had demonstrated "irreparable harm and the

1    other factors" necessary to receive injunctive relief.

2    Since then, discovery has not only confirmed the Court's earlier inclinations, it has

3    revealed that ████████████████████████████████████████████████████████

4    ████████████████████████ ██████████████████████████████████████████████

5    ████████████████████████████████████████████████

6    ████████████████████████████████████████████████

7    ██████████████████████████████████████████████████

8    ████████████████████████████████████████████████████

9    ██████████████████████████████████████████████████████

10   ██████████████████████████████████████████████████

11   ████████████████████████████████

12   That Block's ads were deceptive is also confirmed by three consumer surveys

13   conducted by Stern School of Business Professor Joel Steckel. Among other things, the

14   surveys show that Block's ads were misleading, and continued to mislead consumers even

15   after the consent order was entered. Block has no survey of its own, and its putative survey

16   expert offers minor quibbles with Dr. Steckel's surveys but no substantive evidence to suggest

17   that his findings were wrong. Instead, Block's only answer to the overwhelming evidence

18   against it is its tit-for-tat counterclaim. This obvious gambit fails.

19   Block has also made crystal clear that it wishes to continue its misleading campaign

20   into the next tax season. For the entire 2024 tax season, Block falsely suggested to consumers

21   that "5 million+" TurboTax customers had previously switched to Block. And Block has

22   repeatedly suggested that it will make claims mirroring the challenged ads next tax year. It has

23   urged faster resolution of this case because it is "aggressively" planning for 2025 and believes

24   this lawsuit "may impact [its] advertising during the 2025 season."  Thus, a preliminary

25   injunction is necessary to prevent Block from continuing its false and misleading claims both

26   this year and next tax season. Absent relief, Intuit will be irreparably harmed.

27

28

# BACKGROUND

### A.   TurboTax's Online Tax-Preparation Products

Intuit owns and operates TurboTax, which has long been the nation's leading online tax-preparation provider. Ex. A ¶5.

TurboTax's 2024 product suite offered three service levels of online tax-prep products: (1) "Do-It-Yourself" ("DIY"), (2) "Live Assisted," and (3) "Full Service." *Id.* ¶7. All products came with a "100% Accurate Calculations Guarantee" and access to AI (artificial intelligence) assistance. *Id.* ¶8.

The **TurboTax DIY** product was available to consumers who wanted to complete their tax returns themselves guided by TurboTax online software. *Id.* ¶¶9-11.

**TurboTax Live Assisted (TTLA)** allowed consumers to complete their own tax returns with unlimited guidance from live human tax experts. *Id.* ¶¶12. TTLA offered three product tiers—Basic, Deluxe, and Premium—for tax returns of increasing complexity. *Id.* Up until March 31, 2024, TTLA Basic cost $0 for federal and state filings. Deluxe and Premium cost $89 and $169, respectively, plus $49 per state. *Id.* ¶28. More than 60 million U.S. taxpayers—that is, most consumers who file their taxes online—were eligible to file their taxes for free with TTLA in 2024. *Id.*

TTLA included the option for consumers to receive an **expert final review** before filing their return. *Id.* ¶¶14-17. After preparing the tax return but before filing, every TTLA consumer was prompted to connect with an expert for a final review of the return. *Id.*; Ex. 7 at -2705-07. Consumers who wanted the review were paired with a live expert who would answer any lingering questions and review the consumer's tax return. Ex. A ¶¶14-17; Ex. 7 at -2705-07; Ex. 8 at -25; Ex. D ¶5, Ex. 39 at 17:19-19:18. The goal of the expert final review was to ensure that consumers had complete confidence in their entire return; experts were able to spend as much time on the review as needed to ensure that confidence. Ex. A ¶26; Ex. 39 at 19:2-13; Ex. D ¶5.

If, during the final review, a TTLA consumer indicated that they wanted the expert to (1) enter values directly, (2) confirm their tax liability, or (3) the consumer indicated that they

Public Redacted Version

1    were not confident in their return, the consumer was given the option to have an expert fully

2    prepare, sign, and file their return, which was facilitated through a free upgrade to Full

3    Service. Ex. A ¶18; Ex. D ¶12; Ex. 39 at 83:16-84:22; Ex. 9; Ex. 11. TTLA also included a

4    "100% Accurate, Expert-Approved Guarantee," which promised to reimburse penalties or

5    interest resulting from errors made by an expert. Ex. A ¶¶12, 27.

6        **TurboTax Full Service** matched consumers with a tax expert who prepared, signed,

7    and filed the return on the consumer's behalf. Full Service started at $89 when Block's false

8    and misleading ads ran. *Id.* ¶¶29-30.

9       **B.**     **Block's Online Tax-Preparation Products**

10       Block offers a suite of online tax-prep products under the H&R Block brand. Block's

11    2024 product lineup offered two product tiers: DIY and "File with a Tax Pro." Ex. A ¶¶31-34.

12       The **Block DIY** tier included four products: Free Online, Deluxe, Premium, and Self-

13    Employed. *Id.* ¶35. Free Online provided no AI or expert help, while Block's paid DIY

14    products purported to do so. *Id.* ¶¶36, 40-42. Early in the tax season, Block's paid DIY

15    products "started at" $35 (for Deluxe) plus $37 per state return. *Id.* ¶¶36-39. Block's paid DIY

16    products did not include a final review by a tax expert. Instead, to obtain a final review,

17    consumers were required to pay an extra $55 to $95 for a "Tax Pro Review" add-on product.

18    *Id.* ¶45. Block's paid DIY products offered at least two in-product upsells for Tax Pro Review,

19    including one at the comparable point when Intuit offered its TTLA consumers a free expert

20    final review. *Id.* ¶64; Ex. 32 at -2581, -2613. Like TurboTax's final expert review, Block's

21    Tax Pro Review add-on allowed an expert to review a consumer's completed return and was

22    intended to drive consumer confidence in filing. Ex. 40 at 41:22-42:4, 44:7-9.

23       Block's **"File with a Tax Pro"** product matched consumers with a tax expert who

24    prepared and filed the return on the consumer's behalf. Ex. A ¶48.

25       **C.**     **Block's 2024 Marketing Strategy**

26       Block's 2024 marketing campaign, titled "It's Better with Block," was designed to

27    "demonstrate[] just how easy it is to switch" to Block from "TurboTax." Ex. 46 at -2529, -

28    2535. ███████████████████████████████████

-4-

1　████████████████████████████████████████████

2　█████████████████████████████████████████████

3　█████████████████████████████████████████████

4　████████████████████████████████████████████

5　███████████████████

6　**D.　Block's Deceptive Advertising**

7　　Intuit challenges five ads Block published during the 2024 tax season, which include

8　claims that Block has indicated it intends to repeat during the 2025 tax season.

9　　*First*, as shown in the attached exhibits, Block claimed that its products with expert and

10　AI help "start[ed] at" a lower price ($35) than Intuit's, which Block represented started at $89.

11　Ex. A ¶¶53-59. In reality, Intuit's product with expert and AI assistance (TTLA) started at $0

12　for a federal and state return, and Block's product with expert and AI assistance (DIY Deluxe)

13　started at $72 for a federal and state return. *Compare id.* ¶7, *with id.*, ¶37. ██████████████

14　████████████████████████████████████████████

15　████████████████████████████████████████ *see also id.* at 57:1-13,

16　58:23-59:2; Ex. 51 at -803. Block's ad also incorrectly suggests that its "Do-it-yourself

17　products" with expert help "include free & paid options," Ex. A ¶56—but the free DIY tier

18　does not include expert or AI help, *id.* ¶36.

19　　*Second*, in making the price comparison above, Block also conveyed that its paid DIY

20　products are comparable to TTLA. It made this comparison notwithstanding that (1) TTLA

21　included at no additional cost the option of a final review by a live tax expert, whereas Block

22　charges an additional fee for that service; and (2) TTLA included a guarantee for expert errors

23　not included in Block's paid DIY products. *Compare* Ex. A ¶¶12, 14-18, *with id.* ¶¶45, 49.

24　Block knew when the ads ran that "Intuit markets … expert final review," Ex. 40 at 33:18-22,

25　████████████████████████████████████████████

26　████████████████████████████████████████████

27　████████████████████████████████████████████

28　█████████████████████████████████████████████

1   ████████

2        Block's paid DIY products also differ from TTLA because Block's live expert

3   assistance lacks much of the utility and convenience of the expert assistance provided by

4   TTLA. Customer reviews report that Block's experts are often "not responsive." Exs. 41-45.

5   Block's interface is also designed to make it difficult to connect with an expert. Ex. A ¶¶66-

6   67. And at the end of that process, consumers often struggle to connect with an expert. *Id.*

7        *Third*, Block claimed that its products with AI and expert assistance were "[a]t least

8   $54 less than TurboTax Live." *Id.* ¶68. But, as explained, Intuit offered AI and expert

9   assistance at a lower price ($0 for federal and state) compared to Block's product (at $35 for

10  federal only, with an additional $37 per state). *Compare id.* ¶7, *with id.*, ¶37.

11       *Fourth*, Block claimed that Intuit's Full Service product started at $169, *id.* ¶53, when

12  in fact the starting price was $89, *id.* ¶54.

13       *Fifth*, Block advertising conveyed that more than 5 million "TurboTired" TurboTax

14  consumers "switched" to Block in 2023. Ex. A ¶71. But 5 million TurboTax consumers did

15  not switch to Block, nor anything close, *see id.* ¶¶72-73—████████████

16  ████████   Ex. 40 at 197:4-9. A version of this ad remained live for the entire tax season,

17  incorrectly asserting that "5 million+" consumers had switched from TurboTax to Block.

18  Ex. A ¶¶73-74.

19       **E.   Procedural History**

20       On January 15, 2024, Intuit filed its complaint (amended January 18) and moved for a

21  temporary restraining order to enjoin five false and misleading claims. Mot. for TRO (Dkt. 6);

22  Intuit Am. Compl. (Dkt. 18). During a January 22, 2024 TRO hearing, while conceding that

23  the ads "could have been clearer," Block represented that it had removed or modified most of

24  the challenged ads. TRO Hr'g Tr. at 30:23-32:23 (Dkt. 36).

25       Block denied that its remaining ad—conveying that (1) Block's products with expert

26  and AI assistance started at a lower price than Intuit's and (2) Block's paid DIY products were

27  comparable to TTLA—was misleading. But the Court explained that it was "inclined to find

28  that Intuit has established a likelihood of success on the merits of the false comparison"

because the ad made "a false comparison …. It's not true that [Live Assisted Deluxe] is the

TurboTax Product you have to buy to get what you get, starting at $35, from Block." *Id.* at

36:18-23, 62:1-2. The Court also explained that it was "inclined to" agree with Intuit on

"irreparable harm and the other factors" necessary for relief. *Id.* at 62:13-15.

Block ultimately agreed to a consent order under which it would "take down the

challenged representations" through preliminary injunction proceedings. *Id.* at 80:7-13; *see

also* Consent Order (CO) (Dkt. 38). However, Block has "maintain[ed]" that its ads "were

accurate," CO at 2; TRO Tr. at 31:25-32:3, and that it would remove certain ads only "until

such time as a [PI] hearing can be held" or until "circumstances" "change[]," CO at 1. For the

entire 2024 tax season, Block continued to falsely convey that "5 million+" consumers

switched from TurboTax to Block in 2023. Ex. A ¶¶73-74.

LEGAL STANDARD

A preliminary injunction is warranted when (1) the plaintiff is likely to succeed on the

merits; (2) will likely suffer irreparable harm absent relief; (3) the balance of the equities

favors relief; and (4) relief is in the public interest. *Winter v. NRDC.*, 555 U.S. 7, 20 (2008).

ARGUMENT

**I.     INTUIT IS LIKELY TO PREVAIL ON THE MERITS OF ITS CLAIMS**

Block's deceptive ads violate (1) the Lanham Act; (2) California's Unfair Competition

Law; (3) California's False Advertising Law; and (4) Missouri common law.

**A.     Block's Advertisements Violate The Lanham Act**

A plaintiff prevails on a Lanham Act claim after establishing that the defendant

(1) made "a false statement of fact … in a commercial advertisement about its own or

another's product" that (2) "actually deceived or has the tendency to deceive a substantial

segment of its audience" in a manner that is (3) "material" (meaning "likely to influence

[consumer] purchasing decision[s]"), (4) in "interstate commerce," thereby (5) "injur[ing] the

plaintiff" or rendering the plaintiff "likely to be injured … either by direct diversion of

sales … or by lessening the goodwill associated with [the plaintiff's] products." *Southland Sod

Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997). Intuit is likely to prevail in

-7-

establishing each of those elements. Intuit demonstrated at the TRO stage that Block's

advertising is false, deceptive, material, and harmful. *See* TRO Tr. at 36:18-23, 62:1-2. Intuit's

arguments have gotten stronger with time, as Block's own documents demonstrate the falsity

of its claims and consumer surveys confirm the ads are deceptive.

### 1. Block's Advertisements Are False And Deceptive

A plaintiff demonstrates falsity by showing "that the statement was literally false,

either on its face or by necessary implication, or that the statement was literally true but likely

to mislead or confuse consumers." *Southland Sod Farms*, 108 F.3d at 1139.

The court "presume[s]" "actual deception" when "a statement is literally false" or

when "the defendant intentionally set out to deceive." *Factory Direct Wholesale, LLC v.*

*iTouchless Housewares & Prods., Inc.*, 411 F. Supp. 3d 905, 924 (N.D. Cal. 2019). Because

all of Block's challenged ads were literally false—and separately, because Block *knew* the ads

were false yet published them anyways them anyway—*see* pp.8-13, the ads are presumed to

have actually deceived consumers. *Factory Direct Wholesale*, 411 F. Supp. 3d at 924.

Even without a presumption, evidence demonstrates that all of Block's ads are likely

to deceive a substantial number of consumers. Ads are likely to deceive where, as here, they

"actually convey[] the [misleading] implied message." *Genus Lifesciences Inc. v. Lannett Co.*,

378 F. Supp. 3d 823, 833 (N.D. Cal. 2019).

### a. Block's false and misleading claim that TurboTax products with expert and AI help were more expensive than Block's

Block falsely claimed that its paid DIY products offering "expert" and "AI" assistance

"starting at" $35 were cheaper than Intuit's product with expert and AI help (i.e., TTLA)

starting at $89. ██████████████████ Ex. 40 at 114:4-10, Ex. 51 at -803; Ex. 52 at -1217,

TTLA Basic was available for $0 through March 31, 2024. Ex. A ¶28. Meanwhile, Block's

product with expert and AI assistance (DIY Deluxe) started at $35 for a federal return or $72

for a federal and state return. *Compare id.* ¶7, *with id.* ¶37. Thus, Block's ad was "literally

false," *Southland Sod Farms*, 108 F.3d at 1139, because Block "[o]mitted … the material fact

that the two products compared in the ad were in different price ranges." *Clorox Co. v. Reckitt*

*Benckiser Grp.*, 398 F. Supp. 3d 623, 638 (N.D. Cal. 2019). TTLA actually "start[ed]" *at least*

-8-

1    *$35 cheaper* than Block's product.

2         Block argued that its ad was literally true because it specifically referenced TurboTax's

3    "Live Assisted Deluxe" product, which in fact cost $89. TRO Opp. (Dkt. 21) at 17-18. Block

4    also suggested that the ad was truthful because it directly compared TTLA Deluxe to Block's

5    DIY Deluxe, which cover similar tax situations. *See* TRO Tr. at 52:14-53:8. Setting aside that

6    Block admits its ad made no mention of DIY Deluxe, Ex. 40 at 160:6-9, and thus cannot have

7    directly compared it to TTLA, both arguments miss the point. Block's ad highlighted the

8    "starting" price of Block's product, while quoting the intermediate price of Intuit's, with

9    surrounding context ("hidden fees") reinforcing the false notion that Block's prices were

10   substantially cheaper than TurboTax's.

11        Survey evidence confirms that Block's ad conveyed that its paid DIY products offering

12   expert and AI assistance starting at $35 were cheaper than Intuit's comparable product, which

13   started at $89 according to Block's ad. Dr. Steckel's "Perceptions Study" found that 53% of

14   consumers who understood that the ads were comparing Block and TurboTax products

15   incorrectly believed that Block's advertised DIY products had similar features to but were

16   cheaper than TTLA, when in fact TTLA was available for $0 for the majority of the viewing

17   audience. Ex. 58 ¶54 (Fig. 10). Dr. Steckel also explains that Block's clearly comparative ads

18   are likely to "mislead consumers into believing [Block's and TurboTax's] products offer the

19   same features and services," with the Block product simply "at a lower cost." *Id.* ¶89. The

20   magnitude of the price disparity—$54—increases that likelihood of deception because "the

21   larger the discount level between the comparison and actual price cues, the more favorable

22   will be the price-related responses." *Id.* ¶66. Sophisticated consumers were also misled by

23   Block, as demonstrated by a Business Insider article that adopted and published Block's false

24   price comparisons—including that the starting price for any TurboTax product was $89—in an

25   early 2024 tax-preparation review article. Ex. A ¶70. After Intuit identified these errors to

26   Business Insider, the magazine quickly published a correction. *Id.*

27

28

b.      **Block's false and misleading claim that Block's paid DIY products were comparable to TurboTax Live Assisted**

The same ad also falsely represented that Block's paid DIY products were comparable to TTLA. When a comparative "advertisement omits differences [between the products] which would have been material to recipients," that ad is "literal[ly] fals[e]." *Clorox Co.*, 398 F. Supp. 3d at 638. Block's paid DIY products were materially different in three respects.

*First*, TTLA includes an "expert final review" that is materially distinct from the expert assistance Block offers in its paid DIY products. Block's expert assistance, if you can reach it, *e.g.*, Ex. A. ¶¶66-67, functions solely like a help line, *see* Ex. 40 at 52:9-13. TTLA also provides "help line" or "as-you-go" (AYG) expert assistance. Ex. A ¶13. The expert final review provides something different: all consumers are prompted to connect with an expert for a final review where an expert can answer any and all remaining questions and ensure that the consumer is confident in their entire return. *Id.* ¶¶14-17; *see also* Ex. 8 at -25-27; Ex. 39 at 80:25-81:10. That final review supplements both the AYG help and automated software review. Ex. A ¶26; Ex. D ¶¶3-5. Block acknowledges that a final review is "different" than AYG "online [expert] chatting" and provides "clients … the confidence of filing an accurate, tax preparer approved tax return wile maintaining the do-it-yourself control, convenience, and value." Ex. 52 at -1223; Ex. 40 at 42:20-25.

Intuit invests heavily in offering an expert final review: ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 39 at 163:2-12; Ex. D ¶¶5-6.

Over ▮▮▮▮▮▮▮▮▮▮▮ received an expert final review in 2024. Ex. A ¶25.

Block's paid DIY products do not include such a final review. Instead, Block repeatedly prompts consumers to *purchase* a final review through its Tax Pro Review product, including at the end of the product experience. Ex. 32 at -2581, -2613; Ex. 40 at 42:17-19; 44:1-2. Because of those persistent upsells, reasonable consumers would believe that any Block paid DIY final review is offered only through Tax Pro Review and would not believe

-10-

such review is included in its "help line" assistance. Indeed, 

anyway.

*Second*, TurboTax's expert final review includes the option to have an expert prepare, sign, and file the return at no additional cost, facilitated through a free upgrade to Full Service. Ex. A ¶18-20; Ex. D ¶12. By contrast, Block's paid DIY products do not offer that option; consumers who want their review signed by a tax expert must pay the add-on fee for Tax Pro Review. Ex. 40 at 42:17-19; 44:1; *compare* Ex. 7 (TurboTax walkthrough), *with* Ex. 32 (Block walkthrough).

*Third,* TTLA includes a guarantee to reimburse consumers for penalties and interest resulting from errors made by a tax expert. Block's paid DIY products include *no* comparable guarantee, despite providing access to expert help. *Compare* Ex. A ¶27, *with id.* ¶49.

As explained below in Section I.A.2, all of these differences are material to consumers because they are key product features that influence purchasing decisions. *Southland Sod Farms*, 108 F.3d at 1139. But Block "omit[ted] … the[se] material differences" and drew an impermissible "apples-to-apples" comparison, which "portrayed as otherwise equivalent" two "non-comparable [apples-to-oranges] products." *Clorox Co.*, 398 F. Supp. 3d at 637, 641-642. Such a comparison is "literally false by necessary implication." *Id.*

Again, survey evidence confirms what is already apparent: consumers viewing Block's ad "generally believe" that Block's paid DIY products have "comparable product features and services to" TTLA. Ex. 58 ¶¶36, 48. Dr. Steckel's Perceptions Study reveals that 89% of

consumers who understood the ad to be comparing Block's product to a competitor's believed

that Block's advertised DIY products included comparable or additional product features

compared to TurboTax's. *Id.* ¶¶51, 54. In reality, it is TurboTax's product that had additional

features. *Compare* Ex. A ¶¶12, 14-18, 27, *with id.* ¶¶45, 49.

Block has argued that its "Tax Pro Review" product is better than TurboTax's "expert

final review." TRO Opp. 7-8. As explained, ████████████████████████████████████████,

that is not correct—the major difference between TTLA's final review and Block's Tax Pro

Review is that the TTLA final review is included at no additional cost and is thus **"free."** Ex.

52 at -1217. Moreover, as with Tax Pro Review, consumers who take an expert final review

can have a tax expert complete, sign, and file their return. Ex. A ¶18. Regardless, whether

Block's Tax Pro Review is better than TTLA is irrelevant, since that fact (even if true) says

nothing about whether Block's advertising failed to disclose material differences between

Block's paid DIY products (which do not include Tax Pro Review) and TTLA. Because TTLA

includes services that Block's paid DIY products do not, the comparison remains "apples-to-

oranges." *Clorox Co.*, 398 F. Supp. 3d at 637.

c.   **Block's false and misleading claims that 5 million+ TurboTax consumers switched to Block**

On its website and in email ads, Block falsely conveyed that 5 million "TurboTired"

TurboTax users "switched" to H&R Block in 2023, encouraging others to do the same. Ex. A

¶71. But as Block's own data shows, ███████████████████████████████████████████████.

*See* Ex. 54 at -2084; Ex. A ¶¶72-73. ████████████████████████████████████████████

██████████████████████████████████████████ Ex. 40 at 197:4-9. After Intuit

brought this lawsuit, Block stopped sending the challenged emails and added a disclosure to its

website. However, that disclosure—which states that the "5 million+ consumers" who

"switched" to Block represented the "[t]otal number of new customers using assisted or DIY

tax solutions regardless of other prior tax preparer or method"—was added to the very bottom

of the webpage, far below the misleading claim, and thus is easily missed. Ex. A ¶¶73-74. It

therefore fails to alter the message conveyed by Block's "5 million+" switcher ads. Indeed,

Block's current website states that "Switching from TurboTax is easy," and that "5 million+

-12-

switched to Block in 2023." *Id.* ¶74; Ex. 38. Thus, with or without the disclosure, the ad conveys that the 5 million who switched to Block had switched "from TurboTax." As Block must concede, that figure is false. Ex. 54 at -2084. Even if not literally false, "false representations made by implication or innuendo" are just as unlawful as "literal falsehood." *Simpson Strong-Tie Co. v. MiTek Inc.*, 2021 WL 1253803, at *3 (N.D. Cal. Apr. 5, 2021).

As with Block's other ads, survey evidence confirms that these were likely to mislead consumers. Dr. Steckel's "TurboTired Study" shows that nearly half of all consumers viewing Block's ad incorrectly believed that the "5 million+ who switched to Block last year" had switched from TurboTax. Ex. 58 ¶¶25, 102, 110. That belief was unchanged after adding Block's asterisk disclosure at the bottom of the screen. *Id.* ¶¶113-114. Stated differently, regardless of whether a disclosure is included at the bottom of the page, roughly half of all consumers incorrectly believed from the ad that over 5 million consumers switched from TurboTax to Block. In contrast, when presented with a modified ad showing the same disclosure stated clearly in-text, a far smaller number of consumers incorrectly believed that 5 million+ had switched from TurboTax. *Id.* ¶110. Dr. Steckel's results thus confirm what courts routinely recognize, which is that "a footnote that [is] 'essentially buried' [does] not cure a deceptive advertisement." *Clorox Co.*, 398 F. Supp. 3d at 642.

#### d.   **Block's false and misleading price claims**

In addition to the false claims discussed above, Block also falsely claimed that (1) TurboTax Full Service started at $169 when at the time it started at $89; and (2) Block's products were at least $54 less than comparable TurboTax products. Ex. A ¶¶53, 68. These statements were literally false, and thus presumptively misleading, because they were simply "factually incorrect," *id.* ¶¶54, 69.

### 2.   **Block's Advertisements Were Material**

A deceptive advertisement is "material" if "the decept[ive statement] … is likely to influence the purchasing decision." *Southland Sod Farms*, 108 F.3d at 1139. All of Block's false and misleading statements were likely to influence consumers' decisions.

1    To start, Block's false and misleading statements are material as a matter of law

2  because they expressly misrepresent the price and characteristics of Intuit's products as

3  compared to a direct competitor. "[I]f [Block] advertises that [it] operates in the same manner

4  as [TurboTax]" but "is less expensive, … this would influence consumers' purchasing

5  decisions." *Quidel Corp. v. Siemens Med. Sols. USA, Inc.*, 2017 WL 4654644, at *4 (S.D. Cal.

6  Oct. 16, 2017).

7    Even absent this presumption, evidence shows that Block's ads likely influenced

8  consumers. As to price, Dr. Steckel's survey evidence demonstrates that consumers

9  consistently rank price as one of the most important features when deciding between online-

10  tax-prep options. Ex. 58 ¶¶82-84 (Figs. 14-16). Consumers generally prioritize free options,

11  prices deemed "a good value" for "services rendered," and comparatively low prices. *Id.* ███

12  ████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████

14  ████████████. Block's "obfuscati[on]" of TurboTax's free products and its inaccurate

15  price comparisons were thus influential because "price differentials convey greater perceived

16  value … while also dissuading consumers from performing additional research." Ex. 58 ¶25,

17  *see also id.* ¶¶64-71, 85-88. Block's claims that TurboTax was "more expensive than …

18  Block for comparable products" likely led consumers to believe Intuit's pricing was

19  "unfair"—rendering consumers less likely to use TurboTax or trust Intuit. *Id.* ¶¶25, 91-94.

20    Block's false comparison concerning the features provided in its paid DIY products

21  and TTLA also influenced consumers. When consumers are led to believe there is a high

22  "degree of similarity between the products being compared," they are more likely "to judge

23  [any] price discrepancy as unfair." *Id.* ¶91; *see also* Ex. 57 at 122:8-12. Block's ads incorrectly

24  led consumers to believe that its paid DIY products were comparable to TTLA when the

25  differences described above are numerous and meaningful. Most notably, Block's ad

26  disregarded a key feature of TTLA—the ability to receive a final review from a tax expert at

27  no additional charge. Block's decision to offer its own *paid* final review demonstrates that it

28  believes that consumers "value" that feature, Ex. 40 at 43:5-7—at a price of at least $55.

-14-

1  Moreover, █████████████████████████████████████████████████

2  ████████████████████████████████████████████████████

3  ████████████████████████████████████████████████████

4  ██████████████████████ Ex. 49 at -937. Intuit's consumer data likewise shows that

5  consumers consider final expert review to be highly valuable, ████████████████

6  ████████████████ Ex. 12; Ex. 39 at 99:2-10; Ex. A ¶¶21-22.

7      Finally, Block's invitation for consumers to join the "5 million+" who had already

8  "switched" from TurboTax was "high[ly]" influential to consumers. It "present[ed] H&R

9  Block as a viable, proven alternative to TurboTax, where purportedly millions of similar

10 consumers appear to have found value in making the switch." Ex. 58 ¶¶25, 119-122. Such

11 claims leverage the "social proof" principle to convince consumers to take a similar action. *Id.*

12 ¶119. Block has recently emphasized its success in getting "many [new]… filers [who] came

13 from TurboTax" this year, underscoring the likely impact from the "switching" claims that

14 persisted throughout the tax season. Ex. 48 at -3264; Ex. 47 at -3242.

15          **3.    Block Caused Its False Statements To Enter Interstate Commerce**

16     "Lanham Act jurisdiction attaches to use of a false statement in interstate commerce, or

17 intrastate commerce which 'affects' interstate commerce." *Eco Elec. Sys., LLC v. Reliaguard,*

18 *Inc.*, 2022 WL 1157481, at *5 (N.D. Cal. Apr. 19, 2022). Communications "published online

19 and shared in emails" satisfy this requirement. *Id.* Block caused its false statements to enter

20 interstate commerce by publishing them online and in emails.

21          **4.    Block's Advertisements Injured And Continue To Injure Intuit**

22     Courts "generally presume[] commercial injury when defendant and plaintiff are direct

23 competitors and defendant's misrepresentation has a tendency to mislead consumers."

24 *ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*, 648 F. App'x 609, 615 (9th Cir. 2016).

25 Because Block's statements all had a tendency to mislead, *supra* pp.8-13, and because the

26 parties are direct competitors, Ex A ¶32, that presumption resolves the injury prong. Indeed,

27 the presumption is particularly powerful here because Block's ads all "dr[ew] a direct

28 comparison between [Block's own] product and the plaintiff's." *Healthport Corp. v. Tanita*

1    *Corp. of Am.*, 563 F. Supp. 2d 1169, 1181 (D. Or. 2008).

2          Even without a presumption, evidence demonstrates that Intuit was injured by Block's

3    deceptive advertising. Intuit's expert report shows both that consumers generally believed

4    from Block's ads that Block's products were cheaper than, and comparable to, TurboTax

5    products, Ex. 58 ¶¶25, 37, 48, 51-52, 110, 113-114, and that the ads were likely to influence

6    more consumers to choose Block over TurboTax, *id.* ¶¶25, 64-71, 85-88, 90-94, 119-122. As

7    Intuit executive Elizabeth Berger explains, the ads caused direct financial harm to Intuit from

8    lost revenue, and reputational harm from consumers' misconception that TurboTax cost more

9    than comparable products from Block. Ex. A ¶¶75-84. Indeed, Block's inaccurate price-and-

10   product-comparison claims have caused Intuit financial and reputational harm not only this tax

11   season, but also in the future due to "the compounding effect of the lost opportunity of

12   potential repeat business going forward," which harms Intuit's profits and causes consumers to

13   "question their relationship with and trust in TurboTax." *Id.* ¶¶77, 80.

14          Finally, "actual consumer confusion" is particularly powerful evidence of commercial

15   injury. *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 828 (9th Cir. 2011). Intuit has

16   shown, through consumer surveys, that consumers were actually deceived by Block's ads,

17   demonstrating "reputational injury flowing directly from the deception wrought by [Block]'s

18   deceptive advertising." *Lexmark Intern, Inc. v. Static Control Components, Inc.*, 572 U.S. 118,

19   133 (2014). Block has offered no survey evidence to suggest otherwise.

20          **B.      Block's Advertisements Violate California and Missouri Law**

21          The parties agree that the California and Missouri claims require the same analysis as

22   the Lanham Act. MTD Opp. (Dkt. 67), 16; *RingCentral, Inc. v. Nextiva, Inc.*, 2021 WL

23   2476879, at *3 (N.D. Cal. June 17, 2021); *SI03, Inc. v. Musclegen Rsch., Inc.*, 2020 WL

24   2468412, at *2 & n.3 (E.D. Mo. May 13, 2020). Intuit is likely to prevail on its state-law

25   claims for the same reasons that it is likely to prevail on its Lanham Act claims.

26   **II.    INTUIT WILL SUFFER IRREPARABLE HARM ABSENT RELIEF**

27          **A.      Intuit's Reputation And Goodwill Will Be Harmed Without An Injunction**

28          Intuit is likely to suffer irreparable harm absent injunctive relief. In fact, Intuit is

-16-

entitled to a presumption of irreparable harm because it demonstrated a likelihood of success

on its claim. 15 U.S.C. §116(a). Block has offered no evidence to rebut this presumption.

Even absent a presumption, the evidence shows that Block's deceptive marketing has

and will continue to undermine Intuit's reputation and attendant consumer goodwill. "A

likelihood of damage to reputation is by its nature 'irreparable.'" *Vineyard House, LLC v.*

*Constellation Brands U.S. Operations, Inc.*, 515 F. Supp. 3d 1061, 1081 (N.D. Cal. 2021). A

company's "reputation and brand" are particularly important in "driving consumer behavior"

in the tax-preparation industry, which involves preparing "highly personal documents that

carry significant financial and legal consequences for consumers." *United States v. H&R*

*Block, Inc.*, 833 F. Supp. 2d 36, 75 (D.D.C. 2011). In two different ways, Block's false and

misleading ads irreparably harm Intuit by tarnishing its "reputation and brand" and

undermining consumers' "trust and … confidence in their tax service provider[]." *Id.*

*First*, by misrepresenting the actual and relative price of TurboTax's products, *see*

*supra* pp.8-13, Block creates the false impression that TurboTax's products are significantly

more expensive than one of its competitor's purportedly comparable products, *see* Ex. 58,

¶¶63-71. Block's false price comparison claims directly undermine the goodwill and positive

reputation that Intuit has worked hard to cultivate. "Intuit has worked hard to build consumer

goodwill and consumer loyalty not just by providing top-tier products for a good value, but by

clearly advertising those products' prices." Ex. A ¶80; *see also id.* ¶¶75-79, 81. However,

consumers who see Block's false ads will question whether TurboTax remains a competitive

product, especially those who may be new to tax preparation or are considering changing

providers. *Id.* ¶¶80, 82. As Dr. Steckel explains, a perception that a company charges higher

prices can result in "negative feelings regarding the pricing of TurboTax products and toward

the TurboTax brand." Ex. 58 ¶93. Specifically, when consumers "expect or believe that they

are entitled to equal prices" across similar products, "they are likely to judge the [perceived]

price discrepancy as unfair … [which,] in turn, can lead to reduced consumer satisfaction and

purchase intention, as well as increased complaints, negative emotions, and negative word-of-

mouth." *Id.* ¶91. That reputational harm goes to the heart of Intuit's brand and "will be

-17-

1    difficult if not impossible to undo." Ex. A ¶78. "Like trying to un-ring a bell, trying to

2    'compensate' after the fact for damage to business goodwill and reputation cannot constitute a

3    just or full compensation." *Vineyard House, LLC*, 515 F. Supp. 3d at 1081.

4        *Second*, by falsely suggesting that "5 million+" TurboTax consumers switched to

5    Block last tax year, Block inaccurately "presents" itself to consumers "as a viable, proven

6    alternative to TurboTax, where purportedly millions of similar consumers appear to have value

7    in making the switch." Ex. 58 ¶¶25, 119-122. "Customers return year after year because they

8    trust TurboTax products." Ex. A ¶80. But Block's "Join the 5 million+ who switched" "from

9    TurboTax" claims leverage the "social proof" principle to directly undermine Intuit's

10   reputation and the trust held by repeat TurboTax consumers by inaccurately suggesting that

11   millions of prior (presumably like-minded) TurboTax consumers decided, for some reason, *not*

12   to return. Ex. 58 ¶119. This "threatened loss of prospective consumers or goodwill certainly

13   supports … irreparable harm." *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d

14   832, 841 (9th Cir. 2001). Indeed, this strategy seems to have worked, as Block celebrated its

15   success in getting TurboTax consumers to switch to Block. Ex 48 at -3264; *see also* Ex. 47 at -

16   3242.

17       **B.    Block Cannot Prove That Relief Is Unnecessary**

18       Injunctive relief is appropriate in a false-advertising case unless "the reform of the

19   defendant [is] *irrefutably* demonstrated and total." *Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793

20   F.2d 1132, 1135 (9th Cir. 1986) (emphasis added). "[A]ny doubt … must be resolved …

21   against the defendant." *Id.* Block cannot meet its "formidable burden" to demonstrate that it

22   will not run deceptive ads going forward. *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013).

23   To start, Block never stopped deceiving consumers: it claimed all tax season that "5 million+"

24   consumers switched from TurboTax to Block. *Supra* pp.12-13. Block has also made clear,

25   both before and during this lawsuit, that it will publish additional false ads about TurboTax

26   next tax season and, indeed, would have done so this season absent the consent order.

27       This lawsuit began because, even after Intuit alerted Block to its false claims, Block

28   "refused to stop violating [Intuit's] rights until [Intuit] brought suit in federal district court."

-18-

*Polo Fashions, Inc.*, 793 F.2d at 1135. And throughout litigation, Block has consistently

"maintain[ed]" that its ads "were accurate," CO at 2, "literally true," TRO Tr. at 31:2, and that

"parties [can] compare whatever they want," CMC Hr'g Tr. at 15:16-17 (Dkt. 88), despite all

evidence to the contrary. Block has also repeatedly urged for a speedy resolution to this case

because it believes "the advertising issues involved … may impact advertising during the 2025

tax season," Rescheduling Stip. (Dkt. 81) ¶6, and because it "hope[s]" for "guidance" given

that it will be "aggressively" planning for next season's ads, CMC Tr. at 10:12-19, 11:3-7.

    Courts have enjoined a competitor's future advertising based on far less. In *Align

Technology, Inc. v. Strauss Diamond Instruments, Inc.*, 2019 WL 1586776, at *16 (N.D. Cal.

Apr. 12, 2019), a competitor's sworn declaration that they had "no intention of resuming

[deceptive] ads" was insufficient to preclude injunction where that competitor had, as here,

"ceased engaging in the challenged conduct only after it was sued and not even immediately

then." And in *U-Haul Intn'l, Inc. v. Jartran, Inc.*, 522 F. Supp. 1238, 1256 (D. Ariz. 1981), the

court extended an injunction to cover an entirely new set of ads with a different focus given

"the nature of [the infringer]'s overall ad campaign and its willingness to utilize false and

deceptive ads to accomplish an immediate goal." *Id.*

    Block's current deceptive marketing targeting TurboTax customers, prior

intransigence, and evident intent to rely on its deceptive claims next tax season demonstrate

that injunctive relief is needed to prevent irreparable harm to Intuit.

    Moreover, the relief requested is appropriately tailored to address Block's deception.

Injunctive relief should not be tailored to specific claims but to "specific harm," and should

"not 'be so narrow as to invite easy evasion.'" *Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d

1105, 1116 (9th Cir. 2012). For that reason, the Ninth Circuit has affirmed false-advertising

injunctions that go beyond the specific challenged ads and prohibit similar false claims—such

as broadly prohibiting "any advertisement" that "falsely or deceptively states that [the

defendant] saves consumers money by reason of the prices charged … while mentioning,

displaying, or otherwise directly referring to" the plaintiff. *U-Haul Intn'l, Inc. v. Jartran, Inc.*,

793 F.2d 1034, 1043 (9th Cir. 1986). Here, Intuit seeks to prevent Block from (1) suggesting

that Block's products "start at" cheaper prices than TurboTax's when TurboTax offers the advertised features for less; (2) comparing materially different products without disclosing those differences; (3) misstating the price of TurboTax products; and (4) implying that more TurboTax customers switched to Block than actually did so. Intuit's proposed injunction is thus narrowly tailored to address the "specific harm" from Block's deceptive ads.

## III.   THE EQUITIES FAVOR AN INJUNCTION

The balance of the equities favors an injunction. Where, as here, "the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument … 'merits little equitable consideration.'" *Sream, Inc. v. Sahebzada*, 2019 WL 2180224, at *10 (N.D. Cal. Mar. 6, 2019), *adopted*, 2019 WL 2180215 (N.D. Cal. Mar. 28, 2019). That is the case here: an injunction would stop Block from profiting off of "conduct that is already prohibited" and from disseminating false statements. *Id.* Block may still advertise its products in any medium it wants using any strategy it wants, except by making false or misleading statements.

## IV.   THE PUBLIC INTEREST FAVORS AN INJUNCTION

Finally, "[t]here is a strong public interest in preventing false advertising of products in the marketplace." *Monster Energy Co. v. Vital Pharmaceuticals, Inc.*, 2023 WL 2918724, at *7 (C.D. Cal. Apr. 12, 2023). Because Block's advertising is false and misleading, an injunction is warranted to stop those claims and avoid further consumer confusion and any resulting harm. *United Tactical Sys., LLC v. Real Action Paintball, Inc.*, 2014 WL 6788310, at *24 (N.D. Cal. Dec. 2, 2014). That interest is all but dispositive given that any "injunction does not prevent consumers from buying [Block]; it prevents [Block] from misleading consumers." *Monster Energy Co.*, 2023 WL 2918724, at *7.

### CONCLUSION

The Court should grant Intuit's preliminary-injunction motion.

Dated: July 26, 2024

Respectfully submitted,

*/s/ Sonal N. Mehta*

Sonal N. Mehta (CA Bar No. 222086)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000
Facsimile: (650) 858-6100
Sonal.Mehta@wilmerhale.com

David Z. Gringer (*pro hac vice*)
Kalyn Heyen (*pro hac vice*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich St.
New York, NY 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888
David.Gringer@wilmerhale.com
Kalyn.Heyen@wilmerhale.com

Derek A. Woodman (*pro hac vice*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Ave NW
Washington, DC 20037
Telephone: (202) 663-6000
Facsimile: (202) 230-6363
Derek.Woodman@wilmerhale.com

*Attorneys for Intuit Inc.*

| Exhibit | Description | Bates |
|---------|-------------|-------|
| **A** | **Declaration of Elizabeth Berger** | |
| 1 | "Best Tax-Preparation Software 2024," *Time* Personal Finance, June 4, 2024 | INTUIT_BLOCK_00003578 |
| 2 | "The Best Online Tax Filing Software," *New York Times* Wirecutter, Feb. 7, 2024 | INTUIT_BLOCK_00000554 |
| 3 | Screenshot of TurboTax Products & Pricing Webpage, Jan. 14, 2024 | INTUIT_BLOCK_00003605 |
| 4 | Screenshot of TurboTax Guarantees Webpage | INTUIT_BLOCK_00003593 |
| 5 | Screenshots of Consumer Experience Getting As-You-Go Live Expert Help in TurboTax Live Assisted | INTUIT_BLOCK_00002619-2623 |
| 6 | Screenshots of Consumer Experience Being Prompted For As-You-Go Live Expert Help at Beginning of TurboTax Live Assisted | INTUIT_BLOCK_00002678 |
| 7 | Screenshots of Consumer Experience Being Prompted For An Expert Final Review in TurboTax Live Assisted | INTUIT_BLOCK_00002701-2719 |
| 8 | Intuit Internal Help Article | INTUIT_BLOCK_00000025 |
| 9 | Intuit Internal Help Article, ████████████ | INTUIT_BLOCK_00000053 |
| 10 | Screenshot of TurboTax Products & Pricing webpage | INTUIT_BLOCK_00003594 |
| 11 | Public Help Article, ████████████ | INTUIT_BLOCK_00003220 |
| 12 | Spreadsheet of TurboTax tNPS Scores from Tax Year 2023 | INTUIT_BLOCK_00002741 |
| 13 | Spreadsheet of TurboTax Conversion Rates from Tax Year 2023 | INTUIT_BLOCK_00002695 |
| 14 | Intuit Internal Help Article, ████████████ | INTUIT_BLOCK_00000029 |
| 15 | Intuit Internal Help Article, ████████████ | INTUIT_BLOCK_00000035 |
| 16 | Intuit Internal Help Article, ████████████ | INTUIT_BLOCK_00000037 |
| 17 | Intuit Internal Help Article, ████████████ | INTUIT_BLOCK_00000038 |
| 18 | Intuit Internal Help Article, ████████████ | INTUIT_BLOCK_00000043 |
| 19 | Intuit Internal Help Article, ████████████ | INTUIT_BLOCK_00000044 |
| 20 | Intuit Internal Help Article, ████████████ | INTUIT_BLOCK_00000058 |
| 21 | Spreadsheet of TurboTax Live Assisted Statistics in Tax Year 2023 | INTUIT_BLOCK_00002732 |
| 22 | H&R Block, Inc. Annual Report (Form 10-K) (Aug. 17, 2023) | INTUIT_BLOCK_00000568 |
| 23 | Screenshot of H&R Block Homepage Ad, Jan. 11, 2024 | INTUIT_BLOCK_00000190 |
| 24 | Screenshots of Consumer Experience Attempting To Connect With Expert in H&R Block's Paid DIY Product | INTUIT_BLOCK_00002568-2575 |
| 25 | Screenshot of H&R Block Webpage Advertising DIY "+ Tax Pro Review" Prices | INTUIT_BLOCK_00000195 |
| 26 | H&R Block Guarantees Webpage | INTUIT_BLOCK_00002249 |

| 27 | Screenshot of H&R Block 2020 Television Advertisement | INTUIT_BLOCK_00003576 |
|---|---|---|
| 28 | Screenshot of H&R Block TurboTax Comparison Webpage, Jan. 11, 2024 | HRB0000131 |
| 29 | Screenshot of H&R Block TurboTax Comparison Webpage, Jan. 14, 2024 | INTUIT_BLOCK_00000194 |
| 30 | Screenshot of H&R Block Homepage, Jan. 12, 2024 | N/A |
| 31 | Screenshot of H&R Block Homepage, Jan. 14, 2024 | INTUIT_BLOCK_00003570 |
| 32 | Screenshots of Consumer Experience Using H&R Block Paid DIY Product | INTUIT_BLOCK_00002580-2617 |
| 33 | Screenshot of Response from H&R Block's AI Tax Assist | INTUIT_BLOCK_00002575 |
| 34 | Screenshot of H&R Black Webpage, Jan. 10, 2024 | INTUIT_BLOCK_00000221 |
| 35 | *Business Insider*, "TurboTax vs. H&R Block 2024 (Tax Year 2023)," Jan. 5, 2024 | INTUIT_BLOCK_00003595 |
| 36 | *Business Insider* "TurboTax vs. H&R Block 2024 (Tax Year 2023)," Jan. 9, 2024 | INTUIT_BLOCK_00003600 |
| 37 | Screenshot of H&R Block "It's Better With Block" Email Advertisement | INTUIT_BLOCK_00002073 |
| 38 | Screenshot of H&R Block Webpage with Switching Disclosure | INTUIT_BLOCK_00003513 |
| **B** | **Declaration of David Gringer** | |
| 39 | Excerpts of Joe Lillie Deposition | N/A |
| 40 | Excerpts of Heather Watts Deposition | N/A |
| 41 | Consumer Review of H&R Block DIY Product | INTUIT_BLOCK_00003221 |
| 42 | Consumer Review of H&R Block DIY Product | INTUIT_BLOCK_00003223 |
| 43 | Consumer Review of H&R Block DIY Product | INTUIT_BLOCK_00003225 |
| 44 | Consumer Review of H&R Block DIY Product | INTUIT_BLOCK_00003226 |
| 45 | Consumer Review of H&R Block DIY Product | INTUIT_BLOCK_00003227 |
| 46 | H&R Block Q2 FY2024 Earnings Call Transcript | INTUIT_BLOCK_00002525 |
| 47 | H&R Block Q3 FY2024 Earnings Call Transcript | INTUIT_BLOCK_00003241 |
| 48 | H&R Block Q3 FY2024 Earnings Presentation | INTUIT_BLOCK_00003258 |
| 49 | H&R Block ████████████████████████████ | HRB0000919 |
| 50 | H&R Block ███████████████████████████████ ███ | HRB0001482 |
| 51 | H&R Block ███████████████████████████████ ███ | HRB0000802 |
| 52 | H&R Block ████████████████████████████ | HRB0001217, HRB0001218, HRB0001223 |
| 53 | H&R Block Advertisement | HRB0000868 |
| 54 | H&R Block ██████████████████████████████ ██████ | HRB0002079 |
| 55 | H&R Block █████████████████ | HRB0001266 |
| 56 | H&R Block ██████████████████████████ | HRB0001913 |
| 57 | Excerpts of Pierson Curtis Deposition | N/A |
| **C** | **Declaration of Joel H. Steckel, Ph.D** | |
| 58 | Expert Report of Joel H. Steckel | N/A |
| **D** | **Declaration of Danielle Bailey** | |