# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

|  |  |
|---|---|
| INTUIT INC.,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>HRB TAX GROUP, INC., et al.,<br><br>　　　　　　Defendants. | Case No.  5:24-cv-00253-BLF<br><br>**ORDER GRANTING IN PART AND DENYING IN PART INTUIT INC.'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>[Re:  ECF No. 89] |

Between January and April of each year, nearly every household in America undertakes an important civic duty: filing taxes.  Since organizing the requisite financial documents and understanding how they interact with the country's tax laws is no mean feat, many filers look to tax-preparation software for assistance.  One such software provider is Plaintiff Intuit Inc. ("Plaintiff" or "Intuit"), which offers a suite of online tax-preparation products and services under the brand name "TurboTax."  ECF No. 18 ("Am. Compl.") ¶ 3.  Through those products, Intuit aims to "alleviate consumer stress" related to "one of the most sensitive and important aspects of a consumer's financial life."  *Id.* ¶ 3.  And Intuit is not alone in its mission: as Intuit acknowledges, tax preparation software companies "vigorously compete for business" every year, *id.* ¶ 4, as they seek to attract the "tens of millions of taxpayers [who] are researching their tax-filing options and deciding which product they will use," *id.* ¶ 8.  But Intuit alleges that, this year, one of its competitor companies "crossed the line from earnest competition to unlawful deception."  *Id.* ¶ 4.  Intuit accuses Defendants HRB Tax Group, Inc. and HRB Digital LLC (collectively, "Defendants" or "Block") of publishing false and misleading advertisements related to Intuit's products, and seeks an order enjoining Block from doing so in the future.  *See* ECF No. 89 ("Mot.") at 1.

Before the Court is Intuit's Motion for Preliminary Injunction.  ECF No. 89.  Defendants

filed an opposition to the motion, ECF No. 117-1 ("Opp."), and Intuit filed a reply in support of its motion, ECF No. 122 ("Reply").  The Court held an evidentiary hearing and heard argument on the motion on September 30, 2024 and October 1, 2024.  *See* ECF Nos. 151, 152.  For the following reasons, the Court will GRANT IN PART Intuit's motion.

## I.    BACKGROUND

### A.  Intuit's Tax Preparation Products

Intuit's TurboTax suite of tax preparation products includes three service tiers: Do-It-Yourself ("TT DIY"), Live Assisted, and Live Full Service.  ECF No. 149 ("Sept. 30 Hr'g Tr.") at 144:13–21.  TT DIY permits consumers to prepare their own return independently.  *Id.* at 15:15–20.  Live Assisted allows customers to prepare their tax returns largely independently, but it also provides "unlimited access to tax experts to help them with any questions that they may have," among other features.  *Id.* at 15:21–16:7.  And in TurboTax Live Full Service, a customer "actually turn[s] over all of their documents . . . to a tax expert, who would then use their own technology to prepare the return on behalf of that customer and then sign it."  *Id.* at 16:8–13.

The present controversy is largely focused on TurboTax Live Assisted.  Within the Live Assisted product umbrella, there are multiple individual products that a customer may select based "upon the level of tax complexity" of their situation.  *Id.* at 145:1–3.  For example, TurboTax Live Assisted Basic might apply to a consumer with just a W-2 and no additional schedules.  *Id.* at 145:4–7.  TurboTax Live Assisted Deluxe is for a "slightly more complex" tax situation, perhaps one involving "additional deductions and credits" or "mortgage interest."  *Id.* at 145:8–12.  A further variation, Live Assisted Premium, "essentially includes all tax forms [and] schedules."  *Id.* at 145:13–15.

Despite these differences in tax form availability, however, the features in all Live Assisted products are the same.  *Id.* at 145:16–22.  This means that a "consumer['s] experience using [Turbo]Tax Live Assisted Deluxe, for example, is going to be the same experience as a consumer using the [Turbo]Tax Live Assisted Premium" as far as features like tax expert assistance.  *Id.* at 145:23–146:2.  For purposes of this motion, one Live Assisted feature of particular import is "expert final review."  Expert final review involves a "dialogue" between a TurboTax tax expert

2

and a TurboTax Live Assisted consumer, which occurs at the end of the product experience following a prompt asking whether the consumer wants to connect with an expert about their tax return. *See id.* at 16:1–7. Intuit explains the objective of the review as "driv[ing] complete confidence" through comprehensive consideration of the finished return by the tax expert. *See id.*

**B. Block's Tax Preparation Products**

Block also offers a suite of online tax-preparation software and services, and has two tiers of products: Do-It-Yourself ("DIY") and "File with a Tax Pro." *See id.* at 225:22–226:8. Within DIY, there are a further four tiers, including Free Online, Deluxe, Premium, and Self-Employed. *Id.* at 226:17–227:9; Block Ex. 9. DIY Free Online is geared toward simple tax returns and is free. Sept. 30 Hr'g Tr. at 226:20–23. DIY Deluxe is for consumers with more complex tax situations, such as those seeking to "maximiz[e] deduction and credits," so it includes more tax forms. *Id.* at 226:24–227:3. DIY Premium allows reporting of investment or rental income. *Id.* at 227:4–7. And DIY Self-Employed is for self-employed taxpayers who need to file a Schedule C. *Id.* at 227:8–9.

Block's products have certain inbuilt features as well as various add-on options. For example, as of 2024, live expert help and artificial intelligence assistance were made available through DIY Deluxe at no additional charge. *Id.* at 231:15–24. DIY Deluxe also includes an automated accuracy review or error check, year-round support, and various guarantees, among other features. *See id.* at 232:12–233:2; Block Ex. 6. Separately, Block offers "Tax Pro Review" as an add-on, which allows "a DIY consumer, after they have filled out their taxes, the ability to send their tax return to a tax expert" along with their source documents, so that the tax expert can review, sign, and file the return. Sept. 30 Hr'g Tr. at 241:12–24.

**C. The Challenged Advertisements**

It is undisputed that Block has run comparative advertisements for a number of years. This year, however, Intuit alleges that Block went further than usual, disseminating marketing materials that were "misleading to consumers" and that Intuit believed might put its commercial reputation at risk. *Id.* at 147:20–25. In this motion for preliminary injunction, Intuit targets five kinds of advertising claims: (1) claims that Block's products with expert and AI assistance features start at

a lower price than Intuit's products with similar features; (2) claims that Block's paid DIY products are comparable to TurboTax Live Assisted; (3) claims that Block's products with AI and expert assistance cost "[a]t least $54 less than TurboTax Live;" (4) claims that Intuit's Live Full Service product "starts at" $169; and (5) claims suggesting that "5 million 'TurboTired' TurboTax consumers 'switched' to Block in 2023." Mot. at 5–6. Intuit offers a couple of exemplar ads displaying these claims.

First, Intuit points to an advertisement with the headline "Fed up with hidden fees? Make the switch to H&R Block with upfront transparent pricing." *See* Intuit Exs. 23, 30. Underneath that headline, the advertisement displays three "tiles" indicating various product options. *Id.* Each tile has its own headline, as follows: (1) "File taxes on your own," (2) "File your taxes with expert help," and (3) "Let a tax pro file for you." *Id.* The ad looks like this:



Intuit Ex. 30.

This exemplar advertisement goes to the first two categories of challenged advertising

United States District Court
Northern District of California

United States District Court
Northern District of California

claims, and it is related to—although not directly representative of—the third category.  At the evidentiary hearing on September 30, Intuit presented testimony of the multiple problems it sees regarding this advertisement.  According to Intuit's Director of Marketing Strategy, Elizabeth Berger, Intuit found concerning that the middle tile of the advertisement addressed "[f]il[ing] your taxes with expert help" and said that Block had a product to do so "[s]tarting at $35."  Sept. 30 Hr'g Tr. at 148:14–19.  However, the ad did not include the relevant "starting" price for Intuit's products with expert help, which was $0.  *Id.*  Second, the advertisement compared a TurboTax Live Assisted product—Live Assisted Deluxe—with Block's products permitting consumers to file with expert help, meaning Block's paid DIY products.  *See id.* at 148:20–24.  But Block's paid DIY products do not include a final expert review, a difference that Intuit alleges is material.  *See id.* at 148:20–149:3.  Third, Ms. Berger also flagged that "TurboTax Live and TurboTax Live Assisted include[] guarantees," such as that Intuit will "stand behind the advice and the guidance that [its] expert provides to customers."  *Id.* at 149:4–7.  Intuit claims that Block does not offer a similar guarantee with its paid DIY products.  *See id.* at 149:8–9.  Finally, Ms. Berger stated that Block's products make it "incredibly difficult, if not impossible, to actually engage with an expert," whereas doing so is quicker and simpler in TurboTax Live Assisted.  *See id.* at 149:10–22.  Specifically, Intuit points to the fact that Block's product involves interacting with a chat bot through certain prompts prior to being connected to a live expert.  *Id.* at 150:7–21.

For the third category of advertising claims—ads claiming that Block's products with AI and expert assistance cost "[a]t least $54 less than TurboTax Live," *see* ECF No. 150 ("Oct. 1 Hr'g Tr.") at 322:2–5—no exemplar was introduced during the evidentiary hearing, nor did any witness testify directly about Block's advertisements with this claim.  Therefore, the Parties did not offer argument on this category of advertising claim.  *See id.* at 322:2–324:6.

The fourth category of challenged advertising claims are those stating that Intuit's Live Full Service product "starts at" $169.  As with the third category, no exemplar advertisement depicting this claim was admitted during the proceedings on this motion.  However, at the evidentiary hearing, Ms. Berger testified that Intuit introduced "an entirely new pricing strategy for [TurboTax Live Full Service] between the end of Tax Year '23 and the beginning of Tax Year

'24." Sept. 30 Hr'g Tr. at 187:2–9.  Starting in November 2023, Intuit offered Live Full Service to many customers at a starting price of $89, although in prior years the starting price had been $169. *Id.* at 186:25–188:8.  During the time that the $89 price was offered—and until it was contacted by Intuit regarding the inaccuracy—Block ran advertisements stating that the starting price for Intuit's Live Full Service product was $169.  *See id.* at 259:7–261:23.

As an exemplar of the fifth category of advertising claim, Intuit offers a Block marketing email.  *See* Intuit Ex. 37.  In large text, the email states: "It's Better with Block."  *Id.*  Following other content, a tile appears toward the end of the email emblazoned with the headline "TurboTired? Switch and save with Block."  *Id.*  The tile provides a numbered list of instructions for making such a switch, and then concludes with the statement "Join the 5 million+ who switched to Block last year."  *Id.*  The advertisement looks like this:



United States District Court
Northern District of California



### D. Procedural Background

Intuit filed the present suit on January 15, 2024, ECF No. 1, concurrently filing a motion for temporary restraining order ("TRO") and preliminary injunction, ECF No. 6.  Intuit then amended its Complaint on January 18.  ECF No. 18.  The Amended Complaint alleges causes of action under the Lanham Act, 15 U.S.C. § 1125(a), California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500 *et seq.*, and Missouri Common Law related to advertising by H&R Block Inc.  Am. Compl. ¶¶ 92–122.

The Court heard argument on the TRO motion on January 22, 2024.  ECF No. 32.  At the conclusion of the TRO hearing, the Court indicated its tentative ruling to grant the TRO. Thereafter, on January 29, 2024, the Court entered the Parties' Consent Order, in which Block agreed that it had voluntarily removed various challenged advertising statements from its

1    marketing materials, and that it would not re-introduce the statements "absent changed

2    circumstances or until such time as a hearing can be held on Plaintiff's request for a preliminary

3    injunction." ECF No. 38 at 1. Block then answered Plaintiff's Amended Complaint on February

4    27, 2024. ECF No. 49. Two weeks later, Block amended its Answer, asserting Counterclaims

5    that mirrored Intuit's claims in its Amended Complaint. ECF No. 50. The Court set a briefing

6    schedule for the Parties' cross-motions for preliminary injunction, which were ultimately

7    scheduled for hearing on September 30, 2024. *See* ECF Nos. 63, 82. However, Block's motion

8    for preliminary injunction was terminated and its hearing date vacated after the Court granted

9    Intuit's motion to dismiss Block's Counterclaims. ECF No. 121. Block has since filed Amended

10   Counterclaims. ECF No. 125.

11      **E. Summary of Evidence at the Evidentiary Hearing**

12      At the evidentiary hearing on September 30, 2024, Intuit called four witnesses. First, Intuit

13   called Brian Joseph ("Joe") Lillie, Intuit's Director of the Expert Network. Sept. 30 Hr'g Tr. at

14   14:9. Mr. Lillie gave an overview of Intuit's various TurboTax products, and then walked the

15   Court through the product experience a consumer can expect when using a TurboTax Live

16   Assisted product. *See id.* at 15:11–17:11. This walk-through included a demonstration of how a

17   customer accesses live expert assistance as they go through their return, as well as how the

18   customer engages in the expert final review feature. *Id.* at 18:9–32:19. Mr. Lillie also presented

19   two exemplar "expert final review" interactions that Intuit submitted via exhibits, *see id.* at 33:1–

20   38:19; Intuit Exs. 80, 81, as well as information about how Intuit trains its experts to complete

21   these final reviews, Sept. 30 Hr'g Tr. at 40:8–52:4; Intuit Ex. 8. Finally, Mr. Lillie discussed

22   customer use, feedback, and reviews of Intuit's expert-related features. Sept. 30 Hr'g Tr. at 51:3–

23   60:11; Intuit Exs. 12, 59.

24      Second, Intuit called Block's Senior Vice President and General Manager of DIY Tax for

25   H&R Block Digital, Heather Watts. Sept. 30 Hr'g Tr. at 101:10. Intuit elicited testimony from

26   Ms. Watts regarding features offered through Block's tax preparation products, the various

27   advertising claims challenged in this lawsuit, and Block's marketing plans for the 2024 tax season.

28   *Id.* at 103:24–142:14. In addition, Intuit used Ms. Watts's testimony to walk through how

United States District Court
Northern District of California

consumers can access expert and AI assistance through Block's products.  *See id.* at 109:19–115:23.

Third, Intuit called its own Director of Marketing Strategy, Elizabeth Berger.  In addition to describing Intuit's Live Assisted service tier and Intuit's concerns with the challenged advertisements, *see supra* section I.C, Ms. Berger also testified regarding the value of certain TurboTax features.  For example, Ms. Berger explained that Intuit's final expert review is important in assuring consumers that there "will be someone there to back them up and to make sure that [their tax return is] done right."  Sept. 30 Hr'g Tr. at 152:1–17.  Ms. Berger also addressed a *Business Insider* article that came out around the same time as Block's advertisements, which Ms. Berger said was concerning to Intuit as it mis-stated certain product prices and made what Intuit believed were incorrect comparisons between Intuit's and Block's products.  *See id.* at 155:14–157:11; Intuit Ex. 35.  Finally, Ms. Berger testified about the reputational and economic harm to Intuit that she believed was occurring as a result of Block's advertising.  Sept. 30 Hr'g Tr. at 158:3–163:8.

As its last witness, Intuit called Professor Joel Steckel of the New York University Stern School of Business as an expert in survey design and marketing research methodologies.  *See id.* at 200:21–201:23.  Dr. Steckel prepared an expert report, which was not admitted into evidence at the hearing, and provided testimony of his conclusions based upon that report.  Dr. Steckel described completing three studies: the "Perceptions study," the "Purchase Driver study," and the "TurboTired study."  Through the first of those studies, Dr. Steckel concluded that respondents looking at Block's home page—which displayed an advertisement similar to Intuit Exhibit 23—believed that "there were at least as many features in the Block website and that the Block product costs less."  *Id.* at 209:2–9.  Based on the second study (the "Purchase Driver study"), in combination with a review of academic literature, Dr. Steckel concluded that "Block's conduct, which resulted in the perception of an equal or superior product at a lower price, could cause negative feelings regarding the pricing of TurboTax products and harm the TurboTax brand."  *Id.* at 211:13–19.  And through the TurboTired study, Dr. Steckel concluded that Block's email marketing displaying claims that "5 million+" people switched to using Block products "likely did

9

influence . . . consumers to switch to Block" because those consumers "would have understood that . . . the 5 million-plus who switched to Block had all switched there from TurboTax." *Id.* at 214:12–20.

For its presentation, Block called three witnesses. First, Block called Ms. Watts back to the stand. *Id.* at 225:18. Ms. Watts described Block's history and the various products that Block offers. *Id.* at 225:20–228:4. She also discussed the ways in which Intuit's and Block's Deluxe products compare, explained the services offered by Block's tax experts, and discussed how Block's experts are trained. *See id.* at 228:6–244:16; Block Ex. 6. Finally, Ms. Watts explained the anticipated impact on Block if Block were to be prohibited from running comparative advertisements related to TurboTax. *See* Sept. 30 Hr'g Tr. at 244:17–245:16.

Block next called Mike Halvorsen, Block's Vice President of Customer Experience. *Id.* at 256:6. Mr. Halvorsen testified regarding Block's efforts to ensure that marketing claims are accurate and truthful, as well as Block's past practices in running pricing comparison ads related to Intuit's and Block's products. *Id.* at 257:8–259:14. In particular, Mr. Halvorsen testified in detail regarding Block's procedure for ensuring that the price comparison related to Intuit's Live Full Service product was correct, including Block's reaction once "Intuit complained that the pricing reflected in [that] marketing content was inaccurate." *Id.* at 259:10–260:9. He also addressed Block's intentions regarding marketing about the "5 million+" people who switched to Block in 2023, including Block's adoption of an asterisk disclaimer helping to clarify the meaning of that statistic. *Id.* at 262:5–267:13.

Finally, Block called its own expert, Hal Poret, to critique Dr. Steckel's survey studies. Oct. 1 Hr'g Tr. at 280:11. Mr. Poret testified generally regarding the purpose of surveys used in false advertising lawsuits, as well as various best practices for such surveys. *See id.* at 282:6–285:19. Mr. Poret then turned to his critique of Dr. Steckel's studies. He explained that he believed Dr. Steckel's Perceptions study failed to use a proper control, *id.* at 287:21–288:2, and that Dr. Steckel's TurboTired study failed to use the "well-accepted and standard net deception analysis" that Mr. Poret believed most appropriate in a false advertising case such as this one, *id.* at 288:3–6.

United States District Court
Northern District of California

1          Prior to the evidentiary hearing, the Court had instructed the Parties that declarations (and

2    any accompanying exhibits) previously submitted on the docket would not be considered for any

3    witness called in person at the hearing.  In other words, for any given witness, their evidence was

4    to be presented either entirely live or entirely on the papers.  The Parties submitted a joint list of

5    all materials ultimately admitted in the proceedings on this motion for preliminary injunction at

6    ECF No. 159.

7          Intuit's additional materials submitted through papers on the docket included: multiple

8    reviews of Block DIY products, Intuit Exs. 41–45, transcripts and presentations from Block

9    quarterly earnings calls, Intuit Exs. 46–48, internal Block marketing strategy documents and

10   communications, Intuit Exs. 51–52, 54–56, 66, an excerpt from the deposition of Block's director

11   of marketing strategy, Intuit Ex. 57, a declaration from Danielle Bailey, one of Intuit's tax experts,

12   Intuit Ex. D, excerpts from the deposition of Block's investigator, Erica Deplante, Intuit Ex. 64, an

13   email exchange between Ms. Deplante and Block's counsel, Intuit Ex. 65, and screenshots of

14   archived TurboTax webpages from 2019 through 2022, Intuit Exs. 67–70.

15         Block's additional materials submitted through papers on the docket included: screenshots

16   of the TurboTax product experience, Block Exs. 102–04, 110, a TurboTax product feature

17   comparison chart, Block Ex. 105, a declaration from Intuit's director of growth and analytics,

18   Chris Veit, regarding data in an accompanying production file, Block Exs. 106–07, internal help

19   articles provided to Intuit tax experts, Block Exs. 108–09, 111, an Intuit "community article"

20   about securing a complete review of a consumer's tax return, Block Ex. 112, Intuit pricing

21   information for Tax Year 2023, Block Ex. 113, two sets of Responses and Objections to Block's

22   discovery requests, Block Exs. 114–15, internal Block marketing materials, Block Exs. 116–17, a

23   screenshot of an archived TurboTax webpage from 2023, Block Ex. 118, and various excerpts

24   from the deposition of Jennifer Wilkins, an Intuit marketing manager, Block Exs. 130–33.

25         Block also offered the declaration of Erica Deplante, its investigator who purportedly used

26   Intuit's TurboTax Live Assisted product as if she was a typical customer filling out her tax returns.

27   Block Ex. 183; *see* ECF No. 113-83.  However, Ms. Deplante's deposition revealed that she was

28   anything but a "typical customer."  She acknowledged in her deposition that Block's counsel

"directed [her] step by step on what she would like [Deplante] to do."  Intuit Ex. 64 at 15:6–15

("Q.  So [Block's counsel] guided you through using both the TurboTax and H&R Block software.

Is that correct?  A.  She directed me and I inputted.  Correct."  *Id.* at 15:11–15.); *see id.* at 18:7–23.

Because Ms. Deplante's customer experience was entirely based on attorney coaching, the Court

disregards it in its entirety.

## II.    LEGAL STANDARD

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be

granted unless the movant, *by a clear showing*, carries the burden of persuasion.'"  *Lopez v.

Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (citation omitted) (emphasis in original).  "A

plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits,

that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of

equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def.

Council, Inc.*, 555 U.S. 7, 20 (2008).  Where the court concludes the movant has failed to show a

likelihood of success on the merits, the court, in its discretion, need not consider whether the

movant would suffer irreparable injury.  *Guzman v. Shewry*, 552 F.3d 941, 948 (9th Cir. 2009).

## III.    DISCUSSION

### A.  Likelihood of Success on the Merits

The Court will first consider whether Intuit has shown a likelihood of success on the merits

for each challenged advertising statement.  The Parties agree that all four of Intuit's claims involve

the same analysis, which derives from the Lanham Act standard.  *See* Mot. at 16.  Intuit's

likelihood of success on the merits, then, depends upon whether Intuit can show:

> (1) a false statement of fact by the defendant in a commercial advertisement about its own
> or another's product; (2) the statement actually deceived or has the tendency to deceive a
> substantial segment of its audience; (3) the deception is material, in that it is likely to
> influence the purchasing decision; (4) the defendant caused its false statement to enter
> interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of
> the false statement, either by direct diversion of sales from itself to defendant or by a
> lessening of the goodwill associated with its products.

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).  "To demonstrate

falsity within the meaning of the Lanham Act, a plaintiff may show that the statement was literally

false, either on its face or by necessary implication, or that the statement was literally true but

United States District Court
Northern District of California

likely to mislead or confuse consumers." *Id.* at 1139.  An advertising claim accused of literal falsity must be analyzed "in its full context." *Id.*  If a statement is shown to be literally false or if the defendant set out to deceive, "actual deception is presumed." *Factory Direct Wholesale, LLC v. iTouchless Housewares & Prods., Inc.*, 411 F. Supp. 3d 905, 924 (N.D. Cal. 2019) (internal quotation omitted).

Block does not dispute that the claims in question are "commercial advertisement[s] about" their products, nor is it disputed that Block caused the statements to enter interstate commerce.  The Court therefore analyzes (1) falsity, (2) deception, (3) materiality, and (4) injury for each challenged advertising claim.

### 1.    Claims About Expert and AI Help

First, Intuit challenges certain of Block's advertisements that display price comparisons between a subset of the Parties' products.  *See* Intuit Exs. 23, 30.  The dispute over this category of statements largely turns on the Parties' different framings of the advertising claim in question.  Intuit argues that Block "falsely claim[s] that its paid DIY products offering 'expert' and 'AI' assistance 'starting at' $35 were cheaper than Intuit's product with expert and AI help."  Mot. at 8.  Intuit says that these challenged advertisements were "literally false" because TurboTax Live Assisted Basic—which is free for certain customers—includes expert and AI assistance.  *See id.*  In other words, Intuit's understanding of Block's advertisement is that it intended to compare the *starting price* offered by each company for expert and AI assistance of any kind.  Block responds that the point of the ad was *not* to compare the starting price for expert/AI assistance, but rather to compare Block's DIY Deluxe product with Intuit's TurboTax Live Assisted Deluxe product, and that the prices listed were literally true insofar as those were the products being compared.  *See* Opp. at 9.

#### (i)       Falsity and Deception

Under the Lanham Act standard, "[s]tatements are literally false by necessary implication where 'the audience would recognize the claim as readily as if it had been explicitly stated.'" *Clorox Co. v. Reckitt Benckiser Grp. PLC*, 398 F. Supp. 3d 623, 635 (N.D. Cal. 2019) (quoting *Aussie Nads U.S. Corp. v. Sivan*, 41 F. App'x 977, 977 (9th Cir. 2002)).  Based on Block's own

employee's testimony at the evidentiary hearing, the advertisement at issue here is literally false by necessary implication.  Heather Watts, Senior Vice President and General Manager of Block's DIY Tax business, stated at the hearing that this advertisement was "telling consumers that the starting price [to] file your taxes with expert help [using Block's product was] $35 plus $37 additional for [a] state [return]."  Sept. 30 Hr'g Tr. at 116:12–117:9.  At the same time, she admitted that "the starting price to file [a consumer's] taxes with expert help on TurboTax at the time [the] ad ran, was $0."  *Id.* at 117:10–12.  Further, Ms. Watts testified that the bullet points listed on the relevant advertising tile pertain to various Block products, not just Block's DIY Deluxe product: the tile mentions "[o]ptions for deductions, investors, and self-employed," a statement that alludes to Block's DIY Premium and DIY Self-Employed products.  *See id.* at 117:14–21; Intuit Ex. 30.

Given this testimony, the Court does not find credible Ms. Watts's claim that the advertisement intended to compare TurboTax Live Assisted Deluxe with Block DIY Deluxe based on "the tax situations that th[ose] product[s] cover" and "the tax forms that are available" in those products.  Sept. 30 Hr'g Tr. at 227:23–28.  The advertising tile clearly emphasizes the availability of expert assistance—other than the $35 price, the most prominent text on the tile states "File your taxes with expert help."  *See* Intuit Ex. 30.  And the tile says nothing about the specific tax forms available through Block's DIY Deluxe product; instead, it alludes to the tax situations that might be addressed by using multiple different Block products.  Block could easily have emphasized certain specific tax forms if indeed that was the basis for the price comparison, but it did not do so.  Instead, it told customers about the starting price for Block's products that include expert help.  A viewer of this ad would readily recognize the "necessary implication" that the TurboTax product it listed as a comparison was the lowest-priced TurboTax product with expert assistance.  Yet the evidence conclusively established that Intuit had a free product that included expert and AI assistance.  *See* Sept. 30 Hr'g Tr. at 117:10–12 (testimony of Heather Watts); 148:17–18 ("[Ms. Berger:] . . .  At the time that this ad was in market, TurboTax had a file your taxes with expert help product in market for $0[.]").  Therefore, Intuit has shown a likelihood of success on establishing that Block's advertisement is literally false by necessary implication.  *See Clorox Co.*,

14

1    398 F. Supp. 3d at 635.   As to the second prong, because the statement about the starting price for

2    expert assistance was literally false, "actual deception is presumed," so Intuit has shown a

3    likelihood of success on the deception factor.   *Factory Direct Wholesale*, 411 F. Supp. 3d at 924.

4         **(ii)    Materiality**

5         Moving to the third prong of the *Southland Sod* analysis, the Court finds that Intuit's

6    evidence supports a likelihood of success as to materiality.   At the hearing, Intuit called Dr. Joel

7    Steckel to testify about survey studies he conducted related to Block's advertising.   To conduct his

8    "Perceptions study," which looked at consumer responses to the advertisement displayed in Intuit

9    Exhibit 30, Dr. Steckel divided respondents into two groups: one that "examined the original" and

10   one that "examined a modification of that [advertisement]."   Sept. 30 Hr'g Tr. at 206:4–16.   He

11   then asked questions designed to "draw conclusions related to the relevant number of features

12   suggested by the two [versions of the] ad[] and the relevant costs suggested by the two ads."   *Id.* at

13   207:6–11.   Relevant to the first category of challenged advertisements, Dr. Steckel concluded

14   that "respondents thought that there were at least as many features in the Block website and that

15   the Block product costs less."   *Id.* at 209:2–9.   In another of his studies, the "Purchase Driver"

16   study, Dr. Steckel found that "price [was] extremely important," and he also found that

17   approximately one-third of survey respondents identified availability of tax expert assistance as

18   important.   *Id.* at 210:1–12.   Finally, Dr. Steckel summarized academic literature showing that

19   "price comparisons . . . increase[] the purchase likelihood of the brand making the comparison and

20   reduce[] consumers' intent to search for more information."   *Id.* at 210:20–211:7.   In combination,

21   Dr. Steckel's findings support his conclusion that claims that tax expert assistance is available

22   starting at a lower price through Block's products are likely to affect consumer purchasing

23   decisions, since a significant number of consumers are interested in expert assistance and a

24   significant number of consumers also care strongly about the price of the product they select.

25        The Court acknowledges that Block challenged Dr. Steckel's conclusions with its own

26   expert, Hal Poret.   Mr. Poret's key critiques of Dr. Steckel's surveys focused on the Perceptions

27   study and the TurboTired study.   *See* Oct. 1 Hr'g Tr. at 287:21–288:6.   Regarding the Perceptions

28   study, Mr. Poret criticized Dr. Steckel's lack of a "proper control" group, saying that this flaw

United States District Court
Northern District of California

15

United States District Court
Northern District of California

1   "makes it impossible to know how much [of] what he measured is caused by the advertising as

2   opposed to other factors."  *Id.* at 287:23–288:2.  This criticism goes primarily to the conclusions

3   the Court might draw if using Dr. Steckel's evidence to determine whether the advertisement in

4   question was likely misleading or caused actual deception.  In analyzing the initial two *Southland*

5   *Sod* factors for this first category of advertising claims, however, the Court did not rely on Dr.

6   Steckel's testimony, so Mr. Poret's critique does not alter the Court's conclusion on those factors.

7   Regarding materiality, the Court finds evidence supporting a likelihood of success largely in the

8   results of Dr. Steckel's Purchase Driver study, which Mr. Poret did not address in his testimony.

9   Moreover, despite Mr. Poret's concerns about Dr. Steckel's use of a control, the Court is not

10  persuaded that it should ignore Dr. Steckel's finding that 25 percent of respondents who viewed

11  the original advertisement thought it showed that Block's products included comparable or more

12  features than the comparator product (TurboTax Live Assisted Deluxe).  *See* Sept. 30 Hr'g Tr. at

13  208:9–20.  Intuit has presented sufficient evidence to support a likelihood of success on the merits

14  on the third prong of the *Southland Sod* test.

15      **(iii)**   **Injury**

16      Finally, the Court finds that Intuit has established a likelihood of success on the fifth factor

17  of the false advertising test, namely, that Intuit "has been or is likely to be injured as a result of the

18  false statement."  *Southland Sod Farms*, 108 F.3d at 1139.  "[D]iversion of sales to a direct

19  competitor may be the paradigmatic direct injury from false advertising."  *Lexmark Int'l, Inc. v.*

20  *Static Control Components, Inc.*, 572 U.S. 118, 138 (2014).  As such, courts have applied a

21  presumption of injury "when defendant and plaintiff are direct competitors and defendant's

22  misrepresentation has a tendency to mislead consumers."  *TrafficSchool.com, Inc. v. Edriver Inc.*,

23  653 F.3d 820, 826 (9th Cir. 2011) (discussing the presumption in relation to Lanham Act

24  standing); *see Dependable Sales & Serv., Inc. v. TrueCar, Inc.*, 394 F. Supp. 3d 368, 375

25  (S.D.N.Y. 2019) (noting, in deciding a motion for reconsideration, that "[b]ecause no comparative

26  claims were made by a direct competitor, no presumption of injury applie[d]" in the summary

27  judgment analysis).

28      In addition, Intuit provided testimony and other evidence in support of injury.  Intuit's

16

United States District Court
Northern District of California

Director of Marketing Strategy, Elizabeth Berger, testified at the evidentiary hearing that she believed Block's advertisements "absolutely were harmful" to Intuit, in the form of both reputational harm and economic harm (i.e., diverted customers). Sept. 30 Hr'g Tr. at 159:7–162:25. As Dr. Steckel explained, "Block's conduct, which resulted in the perception of an equal or superior product at a lower price, could cause negative feelings regarding the pricing of TurboTax products and harm the TurboTax brand." *Id.* at 211:13–19. Likewise, Dr. Steckel concluded based on the academic literature that "price comparisons . . . increase[] the purchase likelihood of the brand making the comparison and reduce[] consumers' intent to search for more information." *Id.* at 210:24–211:7.

The Court notes one piece of evidence from Intuit that it does not find persuasive in establishing injury: the *Business Insider* article comparing TurboTax and H&R Block products for Tax Year 2023. Intuit Ex. 35. The Court finds it too speculative to conclude that "the article picked up many of the claims . . . highlighted in H&R Block's advertising," Sept. 30 Hr'g Tr. at 155:20–22 (testimony of Elizabeth Berger), given that Intuit was not able to offer any evidence supporting Block's advertisements as the source of the erroneous information in the article, *see id.* at 163:15–164:7. It is certainly possible, particularly in light of Block's marketing slides—which listed *Business Insider* as a target for media campaigns, Intuit Ex. 50 at 9—but the Court finds this proffered evidence of injury too conjectural on the present record. That said, the Court still finds, based on the presumption in favor of Intuit and the expert evidence presented, that Intuit has established a likelihood of success on the merits as to the injury factor.

***

In sum, Intuit has established a likelihood of success on the merits of its Lanham Act claim—and therefore also on each of its other three claims, all of which conform to the Lanham Act standard—regarding the advertisements implying that expert and AI assistance "starts at" a lower price through Block's products as compared to Intuit's products.

### 2. Claims that Block Offers Expert and AI Assistance for $54 Less Than Intuit

Intuit's briefing mentions a related advertising claim that expert and AI assistance is available for at least $54 less through Block's products as compared to Intuit's products. *See* Mot.

at 6.  No exemplar exhibit showing this advertising claim was admitted during the proceedings on the motion for preliminary injunction, nor was there any testimony on this category of challenged advertisement, so the Court does not separately analyze this claim.

However, the Court notes that, to the extent Block is enjoined from claiming that expert and AI assistance "starts at" a lower price with Block than with Intuit, Block will likewise be barred from claiming that expert and AI assistance costs at least $54 less with Block than with Intuit.  As discussed above, Intuit provides expert and AI assistance for free through TurboTax Live Assisted Basic, so such assistance is actually available for *less* with Intuit than with Block.

### 3.  Claims Comparing Paid Block DIY Products with TurboTax Live Assisted

Relying on the advertisement in its Exhibits 23 and 30, Intuit also challenges Block's advertising that compares TurboTax Live Assisted with Block's paid DIY products.  *See* Mot. at 10.  Initially, Intuit's moving papers expressly identified three feature differences that it views as significant enough to render TurboTax Live Assisted and Block's paid DIY products improper comparators:  First, Live Assisted has an "expert final review" feature, included at no additional cost, in which consumers are prompted to connect with an expert for a final review where an expert can answer any remaining questions about the consumer's tax return.  Intuit says this is different from Block's DIY expert/AI features—which Intuit likens to a "help line," Mot. at 10–11—because although both companies' products offer "as-you-go" expert assistance, only TurboTax Live Assisted has the additional "expert final review" feature.  *Id.*  In fact, Block has its own "Tax Pro Review" add-on feature, available at an additional cost, that Intuit argues is more analogous to expert final review.  *Id.* at 10–11.  Thus, Intuit believes it is misleading for Block to compare its DIY products without Tax Pro Review to TurboTax Live Assisted.  *Id.* at 11.  Second, Intuit argues that expert final review permits experts to prepare, sign, and file consumers' reviews at no additional cost via a free upgrade to Full Service, whereas Block's paid DIY products have no such opportunity for a free upgrade.  *Id.*  Third, TurboTax Live Assisted includes a guarantee that consumers will be reimbursed for any penalties assessed due to errors made by the tax expert who assisted the Live Assisted consumer.  *Id.*  Intuit says that Block does not have an equivalent guarantee, and that this is a material difference between TurboTax Live Assisted and Block's DIY

United States District Court
Northern District of California

1    products.  As the proceedings on the motion for preliminary injunction unfolded, Intuit expressly

2    identified a fourth alleged difference between the Parties' relevant products: ease of access to tax

3    experts.  *E.g.*, Oct. 1 Hr'g Tr. at 314:23–24 (identifying "access to experts" as a difference

4    between TurboTax Live Assisted and Block's paid DIY products).

5            Unsurprisingly, Block argues that it is not misleading to compare TurboTax Live Assisted

6    to Block's paid DIY products.  Opp. at 9.  For example, Block says that both companies' Deluxe

7    products "offer nearly identical or substantially similar features and benefits."  *Id.*  Block further

8    argues that Intuit's "expert final review" feature is a "marketing gimmick" that is not significantly

9    different from Block's as-you-go "Help & AI Tax Assist" feature.  *Id.* at 10.  Besides, Block says,

10   the vast majority of TurboTax Live Assisted consumers do not receive an expert final review,

11   since they must take proactive steps to prompt the review process.  *Id.* at 10–11.

12           At the evidentiary hearing, both Parties urged the Court to take a close look at *Clorox*

13   *Company v. Reckitt Benckiser Group PLC*, 398 F. Supp. 3d 623 (N.D. Cal. 2019), in evaluating

14   Block's comparative advertising claims.  Although the posture in *Clorox* was different—that case

15   addressed a motion to dismiss—the Court does find its analysis useful in resolving this motion for

16   preliminary injunction.  In *Clorox*, the plaintiff challenged multiple advertisements that compared

17   certain Clorox bleach cleaning products with Lysol daily cleanser products marketed by the

18   defendant.  *Id.* at 631–633.  The *Clorox* court pointed out that an "'apples-to-oranges' theory of

19   falsity underpin[ned] many of [the plaintiff's] claims in th[e] lawsuit."  *Id.* at 637.  Such a theory

20   is accepted by Lanham Act case law, which provides that a plaintiff "can establish literal falsity

21   . . . by alleging that two products portrayed as comparable in an advertisement are not actually

22   comparable" because the ad "omits differences which would have been material to recipients."  *Id.*

23   at 638.  And in *Clorox*, the apples-to-oranges theory was appropriate at the motion to dismiss

24   stage: Judge Chen found that the products in question were alleged to have "differences in

25   positioning, formulation and intended purpose" that rendered them applicable to entirely different

26   uses—though he acknowledged that the defendant might be able to produce evidence establishing

27   that the products were, in fact, comparable.  *See id.*

28           Here, Intuit identifies four features as "material differences" between its Live Assisted

products and Block's paid DIY products: (1) Intuit's "expert final review" service; (2) Intuit's free

sign-and-file service; (3) the ease of access to expert help through Intuit's products; and

(4) Intuit's expert guarantee. *See* Mot. at 10–11.  The Court will address first whether Intuit has

succeeded in showing that Block's paid DIY products are not comparable to TurboTax Live

Assisted based on the four Live Assisted features Intuit highlights; thereafter, the Court will

address whether any such differences are material to consumers.

Regarding expert final review, the Court finds that Intuit's feature is genuinely different

from Block's features.  Intuit presented credible evidence that its Live Assisted products provide

experts with special tools that facilitate a holistic and expert-driven review process, ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Sept. 30 Hr'g Tr. at 23:6–

24:18 (testimony of Joe Lillie); Intuit Exs. 71, 78.  These tools enable Intuit's experts to

proactively identify any overarching concerns about consumers' prepared returns.  *See* Declaration

of Danielle Bailey, ECF No. 89-62 ¶¶ 6, 9.  Block tries to suggest that the same functionality can

be achieved through its products, pointing to its unlimited expert question-and-answer service and

its automated error check feature.  *See* Sept. 30 Hr'g Tr. at 232:15–19, 252:4–12 (testimony of

Heather Watts); Oct. 1 Hr'g Tr. at 346:1–3 (argument).  In other words, Block argues that a

consumer can get a functionally equivalent service to Intuit's expert final review by asking the

Block tax expert to do a screen share and then walking through the return line by line with the

expert.  The Court disagrees.  Both companies' products permit unlimited question-and-answer

with live experts.  Sept. 30 Hr'g Tr. at 15:21–25 (testimony of Joe Lillie); *id.* at 232:15–19

(testimony of Heather Watts).  This feature is an "as-you-go" Q&A option.  What distinguishes

Intuit's expert final review is that, at the end of the process, a customer can request a final review

in which the expert conducting the review proactively looks for issues and uses unique tools to

help target any such issues.  Block does not have such a proactive expert review service *included*

with its paid DIY products.  *See id.* at 251:6–252:3 (testimony of Heather Watts, acknowledging

that a proactive review is available through Tax Pro Review, which is not included for free with

Block's paid DIY products).

As for the second alleged material distinction, Intuit argues that TurboTax Live Assisted

permits a tax expert to "complete, sign, and file" a consumer's return on their behalf.  Mot. at 11.

Intuit points out that a Block consumer looking for a similar sign-and-file service must "pay the

add-on fee for Tax Pro Review."  *Id.*; *see* Sept. 30 Hr'g Tr. at 251:6–252:3 (testimony of Heather

Watts).  The Court recognizes that although the TurboTax expert final review *permits* the

reviewing expert to request supporting documents and complete, sign, and file a return on a

consumer's behalf via a free upgrade to TurboTax Live Full Service, *see* Intuit Ex. 17, this free

upgrade occurs in only a tiny fraction of cases.  *See* Sept. 30 Hr'g Tr. at 45:22–46:10 (testimony of

Joe Lillie), 74:18–75:10 (indicating that approximately ███████ of Live Assisted customers

receive the free upgrade to Live Full Service); Block Ex. 18.  Still, the Court finds that this, too, is

a genuine difference between the two sets of products.

       Third, Intuit argues that it is far easier to access expert assistance through its Live Assisted

products than through Block's paid DIY products.  Oct. 1 Hr'g Tr. at 314:23–315:22.  The Court

finds that Intuit has not demonstrated that this is a genuine difference between the two sets of

products.  The evidence presented at the hearing establishes that Intuit's and Block's respective

product lines each include "as-you-go" assistance from experts that can be reached using a "help

button" from virtually any page of the tax preparation software experience.  Sept. 30 Hr'g Tr. at

20:1–8 (testimony of Joe Lillie); *see id.* at 238:1–16 (testimony of Heather Watts); Intuit Ex. 32;

Block Ex. 34; *see* Block Ex. 6.  Ms. Watts for Block and Mr. Lillie for Intuit each testified that

their respective company's products enable live help via web chat, phone call, or screen share.

*See* Sept. 30 Hr'g Tr. at 17:6–21 (testimony of Joe Lillie); *id.* at 235:3–21, 252:10–12 (testimony

of Heather Watts).  Other evidence aimed at establishing differences in ease of access to expert

help was of dubious credibility.  For example, the Court does not find that it should lend great

weight to Intuit's witness's representations of her experience that experts "were unavailable"

through the Block product, without more evidence supporting how frequent of an issue this is for

both company's products.  *See id.* at 150:13–21 (testimony of Elizabeth Berger).  And while Intuit

made much of the fact that Block's web chat uses an "AI Assistant" to ask an initial set of

questions before connecting a consumer to a live expert, the Court found persuasive Block's

evidence and arguments showing that the exchange with the AI assistant is quite brief.  *Compare*

United States District Court
Northern District of California

*id.* at 150:7–21 (testimony of Elizabeth Berger), *with id.* at 239:4–25, 253:25–254:13 (testimony of Heather Watts).  Finally, Intuit also brought up the fact that some Block experts are located in India, but the Court understands that Block's experts receive the same training and interact with consumers the same way regardless of their location.  *Id.* at 240:1–5, 240:13–15 (testimony of Heather Watts).  In short, the Court finds that Intuit has failed to demonstrate, by a clear showing, that the two product lines are not comparable regarding ease of access to quality expert assistance.

Finally, Intuit presented evidence that the guarantees offered through TurboTax Live Assisted are meaningfully different from those offered through Block's DIY products.  *Id.* at 149:4–9 (stating that TurboTax Live Assisted offers a guarantee covering the "advice and the guidance that [Intuit's] expert provides," and that no similar guarantee is offered by Block).  On this point, it seems that Intuit is mistaken: Block's witness Ms. Watts did not dispute that "if mistakes were made by an Intuit expert, that will be covered by their expert-approved guarantee," but she also explained that Intuit's witness Ms. Berger's statement that "Block does not include such a guarantee" was incorrect.  *Id.* at 233:23–234:7.  Block simply folds an analogous guarantee into its overarching "accuracy guarantee, . . . [s]o if [Block's] tax expert gave the wrong advice, [Block] would cover that as part of [its] accuracy guarantee."  *Id.* at 234:4–7.  The Court therefore concludes that Intuit has failed to establish, by a clear showing, that this is a genuine difference between the two sets of products.

Having determined that, on the evidence presented, only the expert final review and the free sign-and-file service are genuine differences between Intuit's Live Assisted products and Block's paid DIY products, the Court next analyzes whether either of these differences is material to consumers for purposes of assessing falsity under the Lanham Act.  *See Clorox Co.*, 398 F. Supp. 3d at 638.  As Intuit's briefing suggests, the materiality assessment under the "falsity" prong parallels the analysis for the separate "materiality" prong of the *Southland Sod* test.  *See* Mot. at 11 (stating that the differences are material to consumers "because they are key product features that influence purchasing decisions" (citing *Southland Sod*, 108 F.3d at 1139)).  The *Clorox* case indicates two ways to understand this materiality inquiry:  First, the plaintiff can show that the omitted information is "'likely to influence the purchasing decision' of consumers," generally

United States District Court
Northern District of California

demonstrated through use of consumer surveys. *Clorox Co.*, 398 F. Supp. 3d at 644. Second, the plaintiff can show that "the defendants misrepresented an inherent quality or characteristic of the product." *Id.* (*citing Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1250 (11th Cir. 2002), *and In-N-Out Burgers v. Smashburger IP Holder LLC*, No. SACV 17-1474, 2019 WL 1431904, at *7 (C.D. Cal. Feb. 6, 2019)). Under either variation, Intuit must meet its burden of persuasion "by a clear showing." *See Lopez*, 680 F.3d at 1072; *Johnson & Johnson*, 299 F.3d at 1252 (reversing grant of preliminary injunction where, among other issues, the plaintiff "failed to prove" that use of a particular phrase "had any effect on consumer behavior"). And as a practical matter, the showing required often will not much differ between the two variations: while the "inherent qualit[ies] or characteristic[s]" of a product may sometimes be self-explanatory, any doubts as to what counts as "the very nature" of the product must be addressed by evidence of *why* a consumer sought out a given product—*i.e.*, the primary purpose(s) that drove their consumption activity. *See In-N-Out Burgers*, 2019 WL 1431904, at *7 (citing *POM Wonderful LLC v. Purely Juice, Inc.*, No. CV-07-02633, 2008 WL 4222045, at *11 (C.D. Cal. July 17, 2008), *aff'd*, 362 F. App'x 577 (9th Cir. 2009)).

Regarding expert final review, the Court finds that Intuit fell short of its burden. Intuit does not appear to argue that expert final review is an "inherent quality or characteristic" of its Live Assisted products. However, to the extent that "key product features," *see* Mot. at 11, is meant to invoke that version of the materiality standard, the evidence and argument presented does not convince the Court. It is certainly not as obvious that an expert final review goes to "the very nature" of an online tax preparation product as it was in *In-N-Out Burgers v. Smashburger IP Holder LLC* that "the amount of beef in a burger is an inherent quality or characteristic of a burger," thus going "'to the very nature' of [the] burger product." 2019 WL 1431904, at *7. And looking to the evidence presented, Block elicited testimony that ████████████ of Live Assisted consumers take advantage of the expert final review feature, Sept. 30 Hr'g Tr. at 71:20–72:6, and that Intuit customers must take affirmative steps to secure an expert final review; it does not occur automatically in every case, *see* Block Exs. 33, 39. The Court is skeptical that a feature that must be affirmatively invoked—and if not invoked, is not experienced by the consumer—counts as part

United States District Court
Northern District of California

1    of "the very nature" of a product.  Therefore, the Court finds necessary a clear showing that expert

2    final review actually drives customer consumption.

3            Unfortunately for Intuit, it failed to produce evidence on that very specific question.  In its

4    briefing on the motion, Intuit suggests that internal Block documents establish the materiality of

5    expert final review.  *See* Mot. at 14–15 ("Block's decision to offer its own *paid* final review

6    demonstrates that it believes that consumers 'value' that feature . . . .  Moreover, Block's own . . .

7    'user testing' demonstrated that 'customers understood the product benefits' of expert review.").

8    But Block's internal materials address consumers' views of Block's Tax Pro Review, not Intuit's

9    expert final review.  *See* Intuit Exs. 49 at 19 & 55 at 1.  Although Intuit tries to suggest that a

10   mock-up of an advertisement that was never used shows that expert final review and Tax Pro

11   Review are roughly equivalent, *see* Intuit Ex. 53; Sept. 30 Hr'g Tr. at 132:1–6, the Court is

12   unconvinced.  Tax Pro Review is not analogous to expert final review.  Crucially, with Tax Pro

13   Review, a Block DIY customer "send[s] their source documents along with the tax return" to a

14   Block tax expert, who then reviews, signs, and files the return on the DIY customer's behalf.

15   Sept. 30 Hr'g Tr. at 241:12–24 (testimony of Heather Watts).  It is very rare for a TurboTax expert

16   to sign and file a tax return on a consumer's behalf, and TurboTax Live Assisted customers

17   generally do not send their source documents to their final review tax expert.  *See* Sept. 30 Hr'g

18   Tr. at 45:22–46:10 (testimony of Joe Lillie), 74:18–75:4.  As a result, findings about Tax Pro

19   Review are not obviously applicable to Intuit's expert final review and so will not suffice to carry

20   the burden of establishing by a clear showing that expert final review is material to consumers.

21           The other evidence to which Intuit pointed during closing argument fares no better.  There,

22   Intuit emphasized its tNPS score information showing that consumers who engaged in the expert

23   final review are "super satisfied" and "walking away delighted with that experience."  Sept. 30

24   Hr'g Tr. at 56:5–57:7 (testimony of Joe Lillie); *see* Oct. 1 Hr'g Tr. at 301:5–302:7 (attorney

25   argument); Intuit Ex. 12.  Intuit's customer reviews demonstrate the same: reviewers stated that

26   they "love the expert review," that reviewers were "amazing," and that the reviewers helpfully

27   went through tax returns "with a fine-tooth comb" to help the consumer ensure that errors were

28   addressed and refunds were secured.  *See* Sept. 30 Hr'g Tr. at 58:2–59:6; Intuit Ex. 59.  The

1    problem for the Court is that this evidence gives a sense only of what consumers thought or did

2    *after* choosing to use TurboTax Live Assisted as their tax preparation product, but it does not tell

3    the Court whether those consumers chose the product *because of* the expert final review.  In other

4    words, the evidence does not go to whether the expert final review, specifically, impacts customer

5    purchasing decisions.

6           Dr. Steckel's testimony does not help the Court either.  In his Purchase Driver study, Dr.

7    Steckel concluded that one third of respondents identified availability of "tax expert assistance" as

8    important to their selection of an online tax preparation product.  Sept. 30 Hr'g Tr. at 210:1–12

9    (testimony of Joel Steckel).  But on cross examination, Dr. Steckel admitted that he "did not ask

10   respondents any questions about an expert final review" and that "both the Block and TurboTax

11   products at issue offer live expert help to customers."  *See id.* at 220:7–221:3.  On the record

12   before it, then, the Court has no proof that a significant number of consumers selected Intuit's

13   products based on the expert final review feature.  As Block's cross examination implies, it is

14   *possible* that consumers do not see a difference in value between the type of expert final review

15   offered by Intuit and the as-you-go expert assistance offered by a live expert through either party's

16   products.  *See id.*  Given the "extraordinary" nature of a preliminary injunction remedy, this

17   uncertainty means that Intuit has failed to carry its burden to establish falsity under the "apples-to-

18   oranges" theory by a clear showing that expert final review is a material difference rendering the

19   products incomparable.  Of course, Intuit may ultimately be able to prevail on its "apples-to-

20   oranges" falsity theory by making a sufficient evidentiary showing of materiality at summary

21   judgment or at trial.  Today, the Court merely decides that Intuit has not done enough, at this

22   juncture, to secure a preliminary injunction on this theory.

23          Intuit's showing on the materiality of the free "sign-and-file" service is likewise

24   insufficient.  The evidence at the hearing clearly established that Intuit does not widely advertise

25   this service; indeed, Intuit's own witness, Ms. Berger, admitted that it requires "dig[ging] deep

26   enough" online to even know that such an upgrade is available, since it is "not the foundation or

27   the basis of what TurboTax Live Assisted is."  Sept. 30 Hr'g Tr. at 180:19–181:7, 183:1–15; *see*

28   *also* Block Ex. 13 (showing an Intuit product comparison chart indicating that Live Assisted does

United States District Court

Northern District of California

*not* include a feature in which a consumer's "expert signs and files [their] return"). And the fraction of individuals who are upgraded in this way is vanishingly slim. *See* Sept. 30 Hr'g Tr. at 74:22–75:4 ("[Mr. Lillie]: Specifically, [▮▮▮] would reflect the number of customers who are in the expert final review, and as part of that . . . [are] upgraded into our full service product." [Mr. Kagan]: And you would agree that ▮▮▮ is approximately ▮▮▮▮▮ of the total ▮▮▮▮▮ customers who completed TurboTax Live Assisted, correct?"). The Court therefore concludes that this is not a *material* difference, since no evidence established that consumers are generally aware that this feature is available.

The Court is unable to find based on a clear showing that either of the features the Court found were not comparable is material to consumers. And considering the unadvertised and buried nature of the sign-and-file service, the Court cannot find that in combination these two features drive customer decisions, in order to conclude that the ads display improper "apples-to-oranges" comparisons between TurboTax Live Assisted and Block's paid DIY products. Because Intuit has failed to establish a likelihood of success on its apples-to-oranges theory of falsity, the Court need not analyze the remaining factors of *Southland Sod*. Intuit has not established a likelihood of success on the merits—and therefore no injunction will issue—regarding this second category of advertising claims.

### 4. Claims That Five Million+ Consumers Switched to Block

Intuit's third category of challenged advertisements involves language suggesting that "5 million+ TurboTax consumers switched to Block" in 2023. Mot. at 12; *see* Intuit Ex. 37. Intuit argues that "only ▮▮▮▮▮ of that number" actually switched from TurboTax to Block that year, and that the five million statistic represents the total number of new Block customers—regardless of prior method of preparing taxes. Mot. at 12. Although acknowledging that Block added a disclaimer to that effect on its website after Intuit filed suit, Intuit argues that the disclaimer is easily missed and therefore fails to alter the false and misleading message that those people "switching" to Block are all former TurboTax consumers. *Id.* In response, Block argues that the claim that 5 million+ consumers switched to Block in 2023 is "literally true" insofar as over five million new consumers elected to use Block's products that year, but that "there was one

1    unplanned iteration of this claim in a single e-mail . . . that combined the 5 million+ claim . . . with

2    Block's 'TurboTax switcher' message." Opp. at 16. Block claims not to "intend to resume

3    circulation of any similar advertisement in the future." *Id.* Block goes on to argue that Intuit's

4    expert's study, which concluded that consumers were confused by the 5 million+ switched

5    advertisements, had fundamental flaws that render it unreliable. *Id.*

6    **(i)    Mootness**

7    As a preliminary matter, the Court is unpersuaded by Block's mootness argument

8    regarding the "5 million+" switched advertisements. Block asks the Court to find that "events

9    make it clear that" its "wrongful conduct is not reasonably likely to recur." *Moroccanoil, Inc. v.*

10    *Dermorganic Lab'ys, Inc.*, No. CV 09-4257, 2009 WL 10675634, at *5 (C.D. Cal. Nov. 9, 2009);

11    *see* Opp. at 18. However, "voluntary cessation of allegedly illegal conduct does not deprive the

12    tribunal of power to hear and determine the case . . . unless there is no reasonable expectation that

13    the wrong will be repeated." *Pub. Utilities Comm'n of State of Cal. v. FERC*, 100 F.3d 1451,

14    1460 (9th Cir. 1996) (internal quotation marks omitted) (citing *United States v. W.T. Grant Co.*,

15    345 U.S. 629, 632–33 (1953)). Thus, courts have found disputes moot because the cessation

16    "wasn't improperly undertaken, wasn't solely driven by this particular litigation, and wasn't the

17    result of gamesmanship," *In re Hain Celestial Seasonings Prods. Consumer Litig.*, No. SACV 13-

18    01757, 2017 WL 11633199, at *4 (C.D. Cal. June 20, 2017), or because it occurred significantly

19    prior to the filing of the dispute, *Moroccanoil*, 2009 WL 10675634, at *5. If a defendant's

20    voluntary cessation occurred only "*because of* the litigation," it does not render the dispute moot.

21    *See Pub. Utilities Comm'n*, 100 F.3d at 1460 (emphasis in original).

22    Here, although Block claims it "did not intend to allow the 5 million+ claim to be

23    combined with any claims about any specific competitors, and does not intend to ever run such an

24    advertisement in the future," Opp. at 19, the events in this litigation lend support to a finding of

25    possible gamesmanship on Block's part. Only after the TRO hearing did Block agree to entry of a

26    Consent Order in which it stated that it had "[m]odified its use of the statement 'the 5 million+

27    who switched to Block last year' to include a disclosure" clarifying the meaning of the number.

28    ECF No. 38 at 1. At the same time, Block stated that it would not admit or concede to any

United States District Court
Northern District of California

liability or wrongdoing with regard to those statements. *See id.* at 1–2. Furthermore, the disclosure that Block added was in the form of an asterisk that linked to small text at the bottom of the Block webpage, *see* Block Ex. 8—despite the fact that, in at least one other place, Block has included disclosure language directly below the language demarcated with the disclaimer asterisk, *see* Block Ex. 12. On these facts, the Court does not go so far as to conclude that Block has definitively engaged in gamesmanship, or that Block is virtually certain to reintroduce advertising language that places the "5 million+" language in proximity to language about switching from TurboTax. Rather, the Court simply finds that Block has failed to carry its "formidable burden" to show that it "is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *In re Hain Celestial*, 2017 WL 11633199, at *3 (citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000)).

### (ii)    Falsity and Deception

Having concluded that the dispute over Block's advertising claims placing language about "5 million+" switched in proximity to language about switching from TurboTax is not moot, the Court finds that Intuit has presented sufficient evidence to establish a likelihood of success on the merits regarding falsity under the Lanham Act standard. First, the advertisement in question "necessar[ily] impli[es]" that "5 million+" people switched from Intuit to Block. *See Clorox Co.*, 398 F. Supp. 3d at 635. In the email that Intuit uses as an exemplar for purposes of this motion, the phrases "TurboTired? Switch and save with Block," "Switch from TurboTax® now," and "Join the 5 million+ who switched to Block last year" all appear in the same content box within the email. Intuit Ex. 37. The structure, formatting, and language in that portion of the email work together to imply that the entire content box is about switching from TurboTax specifically; thus, a viewer of the email would conclude "as readily as if it had been explicitly stated" that 5 million+ people switched from TurboTax to Block during the year referenced. *See Clorox Co.*, 398 F. Supp. 3d at 635. Yet Block "knew for certain [they] had ███████ TurboTax switchers" that year—less than ████████ of five million. Sept. 30 Hr'g Tr. at 141:7–10 (testimony of Heather Watts). Intuit has demonstrated a likelihood of success on showing that this ad is literally false by necessary implication, and therefore that there would be a presumption of actual deception.

United States District Court
Northern District of California

1  *Factory Direct Wholesale*, 411 F. Supp. 3d at 924.

2          Even if the ad is not literally false by necessary implication, though, Intuit would still

3  prevail regarding likelihood of success on establishing falsity. *Southland Sod* instructs that

4  "[e]ven if an advertisement is not literally false, relief is available under Lanham Act § 43(a) if it

5  can be shown that the advertisement has misled, confused, or deceived the consuming public."

6  *Southland Sod*, 108 F.3d at 1140. This showing is usually achieved through consumer surveys.

7  *Id.* Accordingly, Intuit instructed Dr. Steckel to conduct a survey measuring consumer responses

8  to Block's email containing the "5 million+" language. At the evidentiary hearing, Dr. Steckel

9  reported the conclusions of this survey, which sought consumer responses to different versions of

10  the email. For Block's original email as well as a variation including an asterisk disclaimer, Dr.

11  Steckel found that more than 50 percent of respondents thought that over five million people had

12  switched from using TurboTax products to using Block's products. Sept. 30 Hr'g Tr. at 213:18–

13  25. For a further variation, which placed the disclaimer language in the body of the email, Dr.

14  Steckel found that 47 percent of respondents still came to the same conclusion. *Id.* at 214:2–11.

15          Granted, Block's expert, Mr. Poret, raised concerns about the results of Dr. Steckel's

16  study. Arguing in favor of the importance of using a "net deception analysis" for false advertising

17  cases, Mr. Poret pointed out that TurboTax and H&R Block are the "dominant names" in the field

18  of online tax preparation. Oct. 1 Hr'g Tr. at 291:10–25. As a result, it is a "natural guess" for a

19  consumer to assume that a Block ad making a comparison statement such as this one refers to

20  TurboTax. *Id.* at 291:20–21. Mr. Poret suggested that using a net deception analysis helps to

21  isolate the level of confusion resulting from the challenged advertisement specifically. But Block

22  has offered no case law supporting Mr. Poret's conclusion that a net deception measurement of

23  "10 to 20 percent or higher" is necessary to show "enough evidence that an ad is misleading." *Id.*

24  at 285:17–19. And further, Intuit presented evidence suggesting that Block ███████████

25  promoted the idea of switching from TurboTax to Block, including through advertising statements

26  like "TurboTired? Switch and save with Block" and "Switching from TurboTax is easy . . . like

27  really easy." *See* Intuit Ex. 50 at 19 (depicting a marketing strategy slide entitled ███████

28  ████████████████████████████████████████████████████████).

In other words, Block itself has created relevant "noise" that may lead respondents to believe the "5 million+" switched language refers to people switching from TurboTax specifically, regardless of whether the specific iteration of the advertisement the respondents review says anything about TurboTax.

In any event, the Court's conclusion that an ad is false in the sense that it is likely to confuse or mislead consumers does not require a net deception baseline (or a specific quantitative value thereof), and it may be informed by the Court's own "experience and understanding of human nature." *See U-Haul Int'l, Inc. v. Jartran, Inc.*, 522 F. Supp. 1238, 1249, 1251–52 (D. Ariz. 1981), *aff'd*, 681 F.2d 1159 (9th Cir. 1982) (citing *McNeilab, Inc. v. Am. Home Prods. Corp.*, 501 F. Supp. 517, 525, 528 (S.D.N.Y. 1980)).  Taking all the evidence and the Court's experience and understanding into account, the Court concludes that Block advertisements combining language about "5 million+" switched with language about switching from TurboTax are false in the sense that they are likely to confuse or mislead consumers.

Intuit has also made a sufficient showing regarding consumer deception.  As a preliminary matter, considering that this is a motion for a preliminary injunction, Intuit has a slightly more forgiving burden for proving actual or likely deception.  *See United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1183 (8th Cir. 1998) (noting that while "a party seeking relief under this section of the Lanham Act bears the ultimate burden of proving actual deception by using reliable consumer or market research," a lesser showing may suffice to secure preliminary injunctive relief).  Intuit has met this burden with Dr. Steckel's testimony, which summarized his study showing that approximately half of respondents viewing Block's "5 million+" switched email were confused into concluding that the number referred specifically to TurboTax switchers.  That a large portion of respondents were *also* confused by Dr. Steckel's control version of the email does not change the fact that many viewers of Block's advertising claim came away from it with the wrong conclusion.

### (iii)    Materiality and Injury

For this set of advertising claims, the Court's analysis on the materiality and injury prongs can be brief.  Regarding materiality, Block's own marketing strategy materials support Intuit's

likelihood of success on the merits: an internal Block marketing presentation states that █████ ████████████████████ and sets out specific strategies for ████████████████ from other tax preparation providers, including TurboTax.  Intuit Ex. 50 at 18–19.  Block's witness Mike Halvorsen testified along the same lines, saying that Block was "trying to convey that it's . . . easier than [consumers] think [to switch], and more people are switching tax providers than maybe they realize."  Sept. 30 Hr'g Tr. at 262:19–263:5.  In other words, Block itself believes that representing to customers the ease of switching from their previous tax preparation product (in this case, TurboTax) to Block's product is material in that it is likely to affect consumer purchasing decision.  Indeed, Block clearly believes that advertising about switching to Block has in past years successfully encouraged consumers to make such a switch.

Finally, for similar reasons as discussed with regard to the first category of advertisements, Intuit has shown a likelihood of success as to injury.  Critically, Intuit's expert testified that "the e-mail marketing likely did influence . . . consumers to switch to Block" by causing them to believe that a large number of consumers were choosing to switch from TurboTax to Block's products—a conclusion that supports the Court's findings regarding Intuit's likelihood of success on both the injury and materiality prongs.  *Id.* at 214:12–23 (testimony of Joel Steckel).

***

In sum, Intuit has established a likelihood of success on the merits regarding Block's use of the "5 Million+" switched language in close proximity to language about switching from TurboTax and is therefore entitled to an injunction related to this category of advertising claims.

### 5.  Claims That TurboTax Live Full Service Starts at $169

Finally, Intuit challenges Block's advertisements claiming that TurboTax Live Full Service starts at $169, saying that, in fact, Full Service was available at $89 at the time those ads were running.  Mot. at 13.  Block responds that its "pricing team checked Intuit's TurboTax website and saw that the Live Full Service Product was listed for $169" and that it "had no reason to believe Intuit would change its prices in January."  Opp. at 17.  As it turned out, Intuit was running "test pricing," where "██ of consumers were able to see . . . a starting price of $89, and ██ were viewing the old . . . starting price of $169."  *Id.*  Block argues that it "cannot be held accountable

1   for false advertising if Intuit is posting two different prices online" without disclosing that prices

2   may differ in certain test markets.  *Id.* at 18.

3           For this category of advertising claims, the evidence presented at the hearing supports

4   Block's mootness argument.  As Ms. Berger acknowledged, "[p]rior to when [Intuit] launched this

5   past tax season, [the] TurboTax Live Full Service price was [$]169."  Sept. 30 Hr'g Tr. at 186:15–

6   16.  Block was familiar with that prior pricing, and Block employees saw only the $169 pricing

7   when researching for their Live Full Service price comparison advertisements this past season.

8   According to witness Mike Halvorsen, Block's Vice President of Customer Experience, a Block

9   manager checked Intuit's website every day to validate the $169 comparison price.  *Id.* at 259:10–

10  260:12; *see* Block Exs. 15, 16.  When Block was contacted by Intuit's team about the $89 price,

11  Mr. Halvorsen and the manager spoke about the discrepancy and "put a process in place to update

12  that content and correct the mistake on [Block's] site."  *Id.* at 260:4–15.  Also, Block has

13  represented that it does not plan to run ads using an inaccurate starting price for TurboTax Live

14  Full Service in the future.  *See* Reply at 11 (acknowledging that Block has "committed to stop

15  publishing . . . ads [showing] . . . incorrect prices").  Most crucially, unlike with the "5 million+"

16  switched language, the Court does not find there to be any extenuating circumstances raising the

17  specter of gamesmanship with respect to this category of advertising claims; rather, it seems that

18  Block's procedure for confirming its competitor's prices resulted in a genuine mistake that has

19  since been addressed.  Thus, the mootness standard is met, and the Court will deny Intuit's request

20  for an injunction related to this category of advertising claims.

21          **B.  Irreparable Harm**

22          Having found that Intuit has shown a likelihood of success on the merits as to two of

23  Block's advertising claims, the Court proceeds to consider whether Intuit "is likely to suffer

24  irreparable harm in the absence of preliminary relief."  *Winter*, 555 U.S. at 20.  Under the Lanham

25  Act, a plaintiff seeking an injunction is "entitled to a rebuttable presumption of irreparable harm

26  . . . upon a finding of likelihood of success on the merits."  15 U.S.C. § 1116(a); *cf. Good Meat

27  Project v. GOOD Meat, Inc.*, 716 F. Supp. 3d 783, 804 (N.D. Cal. 2024) (explaining that "[t]he

28  Lanham Act's presumption of irreparable harm under 15 U.S.C. § 1116(a) does not apply because

United States District Court
Northern District of California

1  [the plaintiff] has not shown that it is likely to succeed on the merits").  Intuit has secured this

2  presumption, and Block has not come forth with evidence tending to rebut the presumption.

3        Regardless of the presumption, Intuit is correct that "[e]vidence of threatened loss of

4  prospective customers or goodwill certainly supports a finding of the possibility of irreparable

5  harm." *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001); *see*

6  *also Vineyard House, LLC v. Constellation Brands U.S. Operations, Inc.*, 515 F. Supp. 3d 1061,

7  1081 (N.D. Cal. 2021).  Intuit has offered concrete evidence supporting injury to its goodwill and

8  reputation in the form of Dr. Steckel's testimony—itself supported by his consumer surveys—that

9  "Block's conduct, which resulted in the perception of an equal or superior product at a lower price,

10  could cause negative feelings regarding the pricing of TurboTax products and harm the TurboTax

11  brand," Sept. 30 Hr'g Tr. at 211:13–19, and could "influence . . . consumers to switch to Block,"

12  *id.* at 214:12–23.  The Court therefore finds that the second *Winter* factor supports granting an

13  injunction.

14      **C.  Balance of Equities**

15        The third *Winter* factor asks whether "the balance of equities tips in . . . favor" of the party

16  seeking an injunction.  *Winter*, 555 U.S. at 20.  In this case, Intuit argues that where "the only

17  hardship that the defendant will suffer is lost profits from an activity which has been shown likely

18  to be infringing, such an argument . . . 'merits little equitable consideration.'"  Mot. at 20 (quoting

19  *Sream, Inc. v. Sahebzada*, No. 18-CV-05673, 2019 WL 2180224, at *10 (N.D. Cal. Mar. 6, 2019),

20  *adopted*, No. 18-CV-05673, 2019 WL 2180215 (N.D. Cal. Mar. 28, 2019)).  In response, Block

21  argues only that an injunction would "impose an undue hardship on Block" because "the

22  challenged ads are literally true and not misleading" and Block should be permitted to "mak[e]

23  truthful and lawful comparative advertisements."  Opp. at 20.

24        While the Court agrees that Intuit's initial proposed order was far too broad in scope, and

25  that Block should not be prohibited from engaging in truthful comparative advertising, the

26  foregoing analysis makes clear that the Court does not agree that all of Block's advertising claims

27  are "literally true and not misleading."  The Court has already found that Intuit established a

28  likelihood of success on the merits as to two of Block's advertising claims, and Intuit is correct

1    that the equities do not favor Block continuing to run advertisements that are likely false and

2    misleading.  Therefore, the third *Winter* factor militates in favor of granting an injunction.

3        **D.  The Public Interest**

4        The final *Winter* factor asks whether "an injunction is in the public interest."  *Winter*, 555

5    U.S. at 20.  On this factor, Intuit argues that "[t]here is a strong public interest in preventing false

6    advertising of products in the marketplace."  Mot. at 20 (quoting *Monster Energy Co. v. Vital*

7    *Pharms., Inc.*, No. EDCV 18-1882, 2023 WL 2918724, at *7 (C.D. Cal. Apr. 12, 2023), *appeal*

8    *dismissed*, No. 23-55438, 2023 WL 7478705 (9th Cir. Aug. 16, 2023), and citing *United Tactical*

9    *Sys., LLC v. Real Action Paintball, Inc.*, No. 14-CV-04050, 2014 WL 6788310, at *24 (N.D. Cal.

10   Dec. 2, 2014)).  Block responds by invoking free market principles, saying that "truthful and

11   accurate comparative advertisements . . . promote robust market competition, which benefits

12   consumers by compelling competitors to improve their products and prices."  Opp. at 20.  Once

13   again, though, Block's argument takes for granted that the Court will agree that all of its

14   advertising claims are likely truthful and not misleading.  In fact, the Court has found that some of

15   Block's ads are likely false or misleading, so Block's argument on the final *Winter* factor is not on

16   point.  The Court agrees with Intuit that it is in the public interest to avoid false advertising, and

17   therefore the fourth *Winter* factor also favors granting an injunction.

18   **IV.    ORDER**

19       For the foregoing reasons, IT IS HEREBY ORDERED that Intuit's motion for preliminary

20   injunction is GRANTED IN PART AND DENIED IN PART.  Intuit is entitled to a preliminary

21   injunction regarding two categories of challenged advertising statements: (1) those suggesting that

22   the "starting" price for expert and artificial intelligence assistance is lower with Block's products

23   than with Intuit's products, and (2) those placing language about "5 million+" people having

24   switched to Block in proximity to language about switching from TurboTax or other language

25   inviting the inference that all 5 million+ people switched to Block's products from Intuit's

26   products.

27       The Court ORDERS Plaintiff Intuit Inc. to submit a proposed injunction, consistent with

28   this Order, after meeting and conferring with Defendants regarding the phrasing of such injunction

order.

**IT IS SO ORDERED.**

Dated:  November 19, 2024

_____
BETH LABSON FREEMAN
United States District Judge